# Matter of D-R-, Respondent

*Decided September 14, 2017*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1)  A misrepresentation is material under section 212(a)(6)(C)(i) of the Immigration and Nationality Act, 8 U.S.C. § 1182(a)(6)(C)(i) (2012), when it tends to shut off a line of inquiry that is relevant to the alien's admissibility and that would predictably have disclosed other facts relevant to his eligibility for a visa, other documentation, or admission to the United States. *Forbes v. INS*, 48 F.3d 439 (9th Cir. 1995), not followed.

(2)  In determining whether an alien assisted or otherwise participated in extrajudicial killing, an adjudicator should consider (1) the nexus between the alien's role, acts, or inaction and the extrajudicial killing and (2) his scienter, meaning his prior or contemporaneous knowledge of the killing. *Miranda Alvarado v. Gonzales*, 449 F.3d 915 (9th Cir. 2006), not followed.

FOR RESPONDENT:  Don P. Chairez, Esquire, Las Vegas, Nevada

FOR THE DEPARTMENT OF HOMELAND SECURITY:  Michael McVicker, Associate Legal Advisor

BEFORE:  Board Panel:  GRANT, MALPHRUS, and MULLANE, Board Members.

MALPHRUS, Board Member:

This case is before us on remand from the United States Court of Appeals for the Ninth Circuit for further clarification of those portions of our decision in *Matter of D-R-*, 25 I&N Dec. 445 (BIA 2011), in which we found the respondent removable under section 237(a)(1)(A) of the Immigration and Nationality Act, 8 U.S.C. § 1227(a)(1)(A) (2006), as an alien who was inadmissible at the time of entry because he willfully misrepresented a material fact under section 212(a)(6)(C)(i) of the Act, 8 U.S.C. § 1182(a)(6)(C)(i) (2006), and under section 237(a)(4)(D) as an alien who assisted or otherwise participated in an extrajudicial killing under section 212(a)(3)(E)(iii)(II).[1] *Radojkovic v. Holder*, 599 F. App'x 646 (9th Cir. 2015).  The respondent's appeal will again be dismissed.

---

[1]  The respondent was also charged under section 237(a)(1) of the Act as an alien who was inadmissible at the time of entry under section 212(a)(7)(A)(i)(I) because he had no valid entry documents.  However, the Immigration Judge's decision did not address that charge and it was not an issue on appeal.

## I. FACTUAL AND PROCEDURAL HISTORY

We incorporate by reference the factual and procedural history set forth in *Matter of D-R-*, 25 I&N Dec. at 446−49, but will also summarize relevant parts of our decision. In addition, we incorporate by reference sections C, D, E, and F of Part II concerning documentary evidence and expert testimony, interpretation issues, the respondent's motion to terminate, and his ineligibility for asylum and other relief and protection from removal. *Id.* at 457−64. Because the Ninth Circuit did not address those portions of our decision, we reaffirm our determinations in them without further discussion.

The respondent is a native and citizen of Bosnia-Herzegovina who was admitted to the United States as a refugee in June 1999 and adjusted his status to that of a lawful permanent resident in 2002. In 2008, the Department of Homeland Security ("DHS") issued a notice to appear, charging that the respondent is removable because he made a material misrepresentation on his refugee application—that is, he did not disclose that he was a Special Police officer and "Squad" (later changed to "platoon") commander in the Republika Srpska during the Bosnian War.[2] In 2009, the DHS lodged an additional charge of removability against the respondent, charging that he had participated in the extrajudicial killing of Bosnian Muslims. This charge was based on information indicating that in July 1995, the respondent and his subordinates took part in capturing 200 Bosnian Muslim men while patrolling a road near Konjevic Polje. These men were deliberately killed shortly thereafter.

The Immigration Judge found that the respondent's deliberate omission from his refugee application that he was a Special Police officer constituted a willful misrepresentation of a material fact under section 212(a)(6)(C)(i) of the Act. She also concluded that the DHS had shown by clear and convincing evidence that the respondent "assisted, or otherwise participated in" extrajudicial killing under section 212(a)(3)(E)(iii)(II) of the Act. Consequently, the Immigration Judge ordered the respondent removed from the United States. On appeal, we affirmed her decision that the respondent is removable as charged.[3]

---

[2]　The respondent continues to refer to the organization in which he served as the "Ikonic National Guard Unit."

[3]　In our April 6, 2011, decision, we remanded the record to allow the respondent to apply for deferral of removal. However, the respondent, who was represented by counsel, declined to apply for that form of protection. The Immigration Judge certified the case to us, and on July 12, 2011, we dismissed the respondent's appeal from the Immigration Judge's November 24, 2009, decision. In May 2012, the respondent was removed from the United States and extradited to Serbia to stand trial for opening fire on civilians on the Bratunac-Konjevic Polje road in 1995 and killing a wounded man a day later. However, the prosecutor produced only one witness and the charges were dismissed in 2014.

On remand, the Ninth Circuit has asked us to clarify our analysis in finding (1) that the respondent's failure to disclose his service as a Serbian Special Police officer during the Bosnian War on his application for refugee status in 1999 was a material misrepresentation and (2) that he assisted in the extrajudicial killing of 200 Bosnian civilian men in July 1995. *Radojkovic*, 599 F. App'x at 647–48. We will reaffirm our decision but will clarify our standard for determining when a misrepresentation is "material" under section 212(a)(6)(C)(i) of the Act. We will also adopt a standard for determining whether an individual has "assisted, or otherwise participated in the commission of . . . any extrajudicial killing" under section 212(a)(3)(E)(iii)(II) of the Act.

## II. ANALYSIS

### A. Material Misrepresentation

For an Immigration Judge to find that an alien is inadmissible under section 212(a)(6)(C)(i) of the Act, there must be clear, unequivocal, and convincing evidence that the alien, "by fraud or willfully misrepresenting a material fact, seeks to procure (or has sought to procure or has procured) a visa, other documentation, or admission into the United States." The respondent conceded that he was an officer in a Special Police unit during the war; that in July 1995, he and his unit were assigned to the Konjevic Polje road where 100 to 200 Bosnian Muslims surrendered to them; and that he lied about his employment on his Form I-590 refugee application. We must decide whether the respondent's omission from his refugee application that he was a Special Police officer during the Bosnian War was a "material" misrepresentation under section 212(a)(6)(C)(i) of the Act.

In *Matter of D-R-*, 25 I&N Dec. at 450–51, we concluded that this omission could have influenced the decision to grant him refugee status. Thus, we agreed with the Immigration Judge that the respondent's concealment constituted a willful misrepresentation of a material fact.

The Ninth Circuit held that we did not correctly apply the standard for determining the materiality of a misrepresentation set forth in *Forbes v. INS*, 48 F.3d 439 (9th Cir. 1995).[4] The court explained that this standard includes

---

[4] The Ninth Circuit's decision in *Forbes* addressed an alien's inadmissibility under former section 212(a)(19) of the Act, 8 U.S.C. § 1182(a)(19) (1976), based on the allegation that he neglected to disclose that he had been arrested and had pending criminal charges when he applied for a visa in 1977. That section provided for the exclusion of "[a]ny alien who seeks to procure, or has sought to procure, or has procured a visa or other documentation, or seeks to enter the United States, by fraud, or by willfully misrepresenting a material fact."

two inquiries: (1) whether the concealments have a "natural tendency to influence" the Government's decision whether to admit the alien to the United States and (2) whether there is sufficient evidence to raise a "fair inference" that a statutory disqualifying fact actually existed. *Radojkovic*, 599 F. App'x at 647–48 (quoting *Forbes*, 48 F.3d at 442–43). Although the Immigration Judge applied both parts of the analysis in *Forbes*, the court noted that we "repeated the first part of the standard used in *Forbes*"—that is, the "natural tendency" test—"but omitted any reference to the second part of the standard"—namely, the "fair inference" test. *Id.* at 647. The court stated that it could not determine whether this omission was an oversight or a deliberate effort to craft a new legal standard to which the court should give deference. *Id.* at 647–48.

On remand, the DHS argues that we are not bound by the Ninth Circuit's standard in *Forbes* because the term "material" in the Act is ambiguous. Pursuant to the tenets of deference set forth in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.* ("*Chevron*"), 467 U.S. 837 (1984), and *National Cable & Telecommunications Ass'n v. Brand X Internet Services* ("*Brand X*"), 545 U.S. 967 (2005), the DHS contends that we should explicitly exercise our authority to define the term "material," because we are the agency charged with administering section 212(a)(6)(C)(i) of the Act.

The United States Supreme Court has held that a circuit court must accord deference under *Chevron* to an agency's interpretation of a statute unless "Congress has directly spoken to the precise question at issue" and congressional intent is clear. *Chevron*, 467 U.S. at 842. The agency's interpretation of a statute applies, regardless of the circuit court's contrary precedent, unless "the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982; *see also Holder v. Martinez Gutierrez*, 132 S. Ct. 2011, 2017 (2012) (holding that the Board's position on a statute "prevails if it is a reasonable construction of the statute, whether or not it is the only possible interpretation or even the one a court might think best"); *Marmolejo-Campos v. Holder*, 558 F.3d 903, 909 (9th Cir. 2009) (en banc) (concluding that the courts should accord *Chevron* deference to the Board because we exercise the "authority to 'give[] ambiguous statutory terms "concrete meaning"'" (alteration in original) (citations omitted)); *Matter of M-H-*, 26 I&N Dec. 46, 49 (BIA 2012).

### 1. "Material"

The term "material" is not defined in section 212(a)(6)(C)(i) or elsewhere in the Act, and the Ninth Circuit has not held that its meaning is unambiguous. Rather, in *Forbes* the Ninth Circuit looked to *Kungys v. United States*, 485

U.S. 759 (1988), for guidance. The issue in *Kungys* was whether a naturalized United States citizen should lose his citizenship—that is, be denaturalized—under section 340(a) of the Act, 8 U.S.C. § 1451(a) (1988), for making false statements on his visa and naturalization applications.[5] The Supreme Court held that the statute "contains four independent requirements: the naturalized citizen must have misrepresented or concealed some fact, the misrepresentation or concealment must have been willful, the fact must have been material, and the naturalized citizen must have procured citizenship as a result of the misrepresentation or concealment." *Id.* at 767.

Because the denaturalization statute did not define the term "material," the Court looked to the lower courts' general understanding of that term in another context—namely, statutes criminalizing false statements to public officials. *Id.* at 769–70. The Court found that the "most common formulation of that understanding is that a concealment or misrepresentation is material if it 'has *a natural tendency to influence*, or was capable of influencing, the decision of' the decisionmaking body to which it was addressed." *Id.* at 770 (emphasis added) (citation omitted). The majority opinion declined to further clarify the meaning of the phrase "natural tendency."

The majority of the Federal circuit courts appear to have adopted the "natural tendency" standard from *Kungys* as a general standard for defining the term "material" in a variety of contexts. Beyond the "natural tendency" standard, however, there is no consensus in the courts as to the interpretation of the term "material" in section 212(a)(6)(C)(i) of the Act, as we discuss more fully below. Thus, because the definition of "material" in this particular context is ambiguous, we may exercise our authority as the agency administering the statute to explain our construction of this term.

### 2. "Fair Inference"

The Ninth Circuit took the second prong of its materiality test—the "fair inference" test—from Justice Brennan's concurrence in *Kungys*. Justice Brennan agreed with the majority's "natural tendency" test, but he added that "a presumption of ineligibility does not arise unless the Government produces evidence sufficient *to raise a fair inference that a statutory disqualifying fact actually existed*." *Kungys*, 485 U.S. at 783 (Brennan, J., concurring) (emphasis added).

Although it was first proposed in a concurrence, the "fair inference" test has been widely held to be controlling in the context of prosecutions

---

[5] Section 340(a) of the Act provides for denaturalization when the certificate of naturalization and citizenship orders "were illegally procured or were procured by concealment of a material fact or by willful misrepresentation."

for unlawful procurement of citizenship or naturalization under 18 U.S.C. § 1425(a) (2012). *See United States v. Mensah*, 737 F.3d 789, 808–09 (1st Cir. 2013); *United States v. Latchin*, 554 F.3d 709, 714 n. 4 (7th Cir. 2009) (listing cases).[6] However, since the Ninth Circuit's remand, the Supreme Court issued *Maslenjak v. United States*, 137 S. Ct. 1918 (2017), which held that § 1425(a) does not require a material misrepresentation. Rather, in relevant part, § 1425(a) imposes a fine or imprisonment on a person who "knowingly procures, or attempts to procure, contrary to law, the naturalization of any person." The Court concluded that the "causal inquiry" in § 1425(a) requires the Government to make a two-part showing. *Id.* at 1928–29. First, it must "prove that the misrepresented fact was sufficiently relevant to one or another naturalization criterion that it would have prompted reasonable officials . . . to undertake further investigation." *Id.* at 1929. Second, the Government "need only establish that the investigation 'would predictably have disclosed' some legal disqualification." *Id.* (quoting *Kungys*, 485 U.S. at 774).

The Court in *Maslenjak* did not include or refer to Justice Brennan's "fair inference" test. In fact, the Court opined, "A yet-stricter causal requirement, demanding proof positive that a disqualifying fact would have been found, sets the bar so high that 'we cannot conceive that Congress intended' that result." *Id.* at 1930 (quoting *Kungys*, 485 U.S. at 777).

We decline to adopt or apply the *Forbes* "fair inference" test to questions of inadmissibility under section 212(a)(6)(C)(i) of the Act. First, although the Ninth Circuit assumed the test to be applicable in *Forbes*, other circuit courts have differed as to whether the "fair inference" test is applicable to the question of the materiality of a misrepresentation. For example, the Seventh Circuit has opined that the test applies to the fourth step in the Supreme Court's analysis of section 340(a) of the Act—that is, to determine whether a "naturalized citizen . . . *procured citizenship as a result* of the misrepresentation or concealment." *Latchin*, 554 F.3d at 713 (emphasis added) (quoting *Kungys*, 485 U.S. at 767) (internal quotation mark omitted); *see also United States v. Nguyen*, 829 F.3d 907, 916–17 (8th Cir. 2016) (noting that the "fair inference" test was applied in *Kungys* to determine whether naturalization was "procured by" the misrepresentation, rather than whether the misrepresentation was "material").

Moreover, when considering the question of inadmissibility under section 212(a)(6)(C)(i) of the Act, other circuit courts have not applied the "fair

---

[6] The Ninth Circuit first referred to the "fair inference" test in *United States v. Puerta*, 982 F.2d 1297, 1303–05 (9th Cir. 1992), a case that involved the prosecution of an alien for unlawful procurement of citizenship under 18 U.S.C. § 1425(a). The court in *Forbes* cited *Puerta* without acknowledging that it was applying the test in a different context. *Forbes*, 48 F.3d at 443.

inference" test. Although some refer to *Kungys*, they apply only the majority's "natural tendency" standard. *See, e.g.*, *Toribio-Chavez v. Holder*, 611 F.3d 57, 64 (1st Cir. 2010) ("Toribio's misrepresentation . . . was undoubtedly material, as it had the natural tendency to influence [the immigration official's] decision not to probe further."); *Parlak v. Holder*, 578 F.3d 457, 465 (6th Cir. 2009) ("Because these misrepresentations clearly had 'a natural tendency to influence the decisions' of the DHS, the [Board] correctly concluded that the misrepresentations were material.") (citation omitted).

The Eleventh Circuit has explained that "a heightened burden of proof [under the fair inference test] is not appropriate in a prosecution that would not result in loss of citizenship." *United States v. Pirela Pirela*, 809 F.3d 1195, 1201 (11th Cir. 2015). In a decision rendered after *Forbes*, the Ninth Circuit also acknowledged that the "fair inference" test was based on the singular seriousness of the potential loss of citizenship. *United States v. Alferahin*, 433 F.3d 1148 (9th Cir. 2006). In that decision, the court held that "the *Kungys* decision established a *more rigorous* definition of materiality that is *unique to the context of denaturalization proceedings*." *Id.* at 1155 (emphases added). The court noted that Justice Brennan's concurrence in *Kungys* "emphasized that 'citizenship is a most precious right, and as such should never be forfeited on the basis of mere speculation or suspicion.'" *Id.* (quoting *Kungys*, 485 U.S. at 783–84 (Brennan, J., concurring)).

Meanwhile, the Supreme Court has declined to decide whether its definition of the term "material" in denaturalization proceedings also applies when considering inadmissibility under section 212(a)(6)(C)(i) of the Act. *Cf. Fedorenko v. United States*, 449 U.S. 490, 509 (1981) (declining to decide whether the standard for materiality outlined in *Chaunt v. United States*, 364 U.S. 350 (1960), applies to false statements in visa applications). In other contexts, the Court has reaffirmed its conclusion in *Kungys* that a false statement is material if it has "a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." *Neder v. United States*, 527 U.S. 1, 16 (1999) (alteration in original) (citation omitted) (relating to conviction for failure to report income on tax returns); *see also United States v. Wells*, 519 U.S. 482, 489 (1997).[7]

---

[7] We also note that after the Ninth Circuit remanded this case, the Supreme Court issued *Universal Health Services, Inc. v. United States*, 136 S. Ct. 1989 (2016). We asked the parties to submit supplemental briefs on what effect, if any, this ruling had on whether the respondent's misrepresentation was material. In its decision, the Court stated that the term "material" is defined in the False Claims Act at 31 U.S.C. § 3279(b)(4) (2012), as "having a natural tendency to influence, or be capable of influencing" the relevant determination,

We conclude that the most reasonable reading of the Supreme Court's decision in *Kungys* is that given by the Seventh and Eighth Circuits—namely, that the "fair inference" test applies to whether the alien "procured" the immigration benefit by his misrepresentation, not to whether the misrepresentation is "material." *See Matter of Y-L-*, 24 I&N Dec. 151, 159 (BIA 2007) (addressing materiality in the context of a frivolous asylum application and citing *Kungys* only for the "natural tendency" standard).

We therefore decline to follow the "fair inference" test set forth in *Forbes*. Pursuant to *Chevron* and *Brand X*, we exercise our authority as the agency implementing section 212(a)(6)(C)(i) of the Act to define the term "material" and apply its definition, including in cases arising in the Ninth Circuit, to promote national uniformity in the interpretation of the Act.

We have already considered the definition of the term "material" in determining whether an alien was "excludable" under former section 212(a)(19) of the Act, the precursor to section 212(a)(6)(C)(i). *See Matter of Bosuego*, 17 I&N Dec. 125 (BIA 1979; 1980). In that case, an Immigration Judge found that an alien had misrepresented certain material facts when she applied for a nonimmigrant transit visa in 1967. The Board ultimately reversed the Immigration Judge's decision and terminated proceedings, because the record was unclear as to the effect of the misrepresentations on the consular officer's decision to issue the visa. In so doing, we concluded that "the materiality requirement . . . is satisfied if either (1) the alien is excludable on the true facts or (2) the misrepresentation tends to shut off a line of inquiry which is relevant to the alien's eligibility and which might well have resulted in a proper determination that he be excluded." *Id.* at 127. We further ruled that the Government must show that the facts "would have likely been uncovered and considered but for the misrepresentation," and then the burden shifts to the alien "to establish that no proper determination of inadmissibility could have been made." *Id.* at 131.

While the Tenth Circuit has viewed the *Kungys* and *Matter of Bosuego* standards as distinct, *Solis-Muela v. INS*, 13 F.3d 372, 376 (10th Cir. 1993), other circuits have cited the two decisions together when considering materiality in this context. *See, e.g.*, *Mwongera v. INS*, 187 F.3d 323, 330 (3d Cir. 1999); *cf. Monter v. Gonzales*, 430 F.3d 546, 556–58 (2d Cir. 2005).[8]

---

using language previously employed by the Court in regard to other Federal fraud statutes. *Id.* at 2002. As the DHS points out, that definition is specifically included in the statutory language and therefore limits the applicability of this case to our decision.

[8] Although the Second Circuit in *Monter* equated the seriousness of deportation with denaturalization and found that "*Kungys* provides the meaning of 'procure' for both statutes," the court did not mention or adopt the "fair inference" test and, indeed, applied both the "natural tendency" test and the burden-shifting test outlined in *Matter of Bosuego* to establish that a proper determination of inadmissibility could not have been made. *Monter*, 430 F.3d at 556–58.

We believe they should be read together. In other words, in our view, the question in *Bosuego* whether a misrepresentation "tends to shut off a line of inquiry which is relevant to the alien's eligibility and which might well have resulted in a proper determination that he be excluded" leads to the same result as asking in *Kungys* whether the misrepresentation had "a natural tendency to influence, or was capable of influencing, the decision of the decisionmaking body."

Thus, we adopt the *Kungys* "natural tendency" test as our general standard for determining whether an alien's misrepresentation is "material" under section 212(a)(6)(C)(i) of the Act. Specifically, we will consider whether the misrepresentation tends to shut off a line of inquiry that is relevant to the alien's admissibility and that would predictably have disclosed other facts relevant to his or her eligibility for a visa, other documentation, or admission to the United States.[9]

Finally, we reaffirm our conclusion in *Matter of Bosuego*, 17 I&N Dec. at 131, that after the DHS meets its burden of proof, the burden shifts to the alien "to establish that no proper determination of inadmissibility could have been made." *See, e.g.*, *Maslenjak*, 137 S. Ct. at 1930 ("Even when the Government can make its two-part showing, however, the defendant may be able to overcome it . . . [and should have] an opportunity to rebut the Government's case . . . ."); *Habib v. Lynch*, 787 F.3d 826, 831–32 (7th Cir. 2015) (stating that the alien could have rebutted the presumption that he acquired lawful permanent resident status as a result of his willful misrepresentation of a material fact by proving that he was eligible for adjustment of status despite the misrepresentation); *cf. Monter*, 430 F.3d at 557 ("[W]here an immigration court finds that an alien has made a material misrepresentation, the [Immigration Judge] must also determine whether that alien has rebutted the resulting presumption that he or she would have been removable if the true facts had been known . . . .").

---

[9]  We also note that the Court's test in *Maslenjak*, 137 S. Ct. at 1922—whether the ensuing investigation "would predictably have disclosed" a legal disqualification—is taken from the majority opinion in *Kungys*:

> [T]he misrepresentation of [the date and place of Kungys' birth in his naturalization petition] would have a natural tendency to influence the citizenship determination, and thus be a misrepresentation of material facts, if the true date and place of birth *would predictably have disclosed* other facts relevant to his qualifications.

*Kungys*, 485 U.S. at 774 (emphasis added) (footnote omitted). In his concurrence, Justice Brennan specifically referenced and concurred with this test before adding his "fair inference" standard. *See id.* at 783.

### 3.  Materiality of the Respondent's Misrepresentation

In determining that the respondent's omission of his Special Police service from his asylum application was material, the Immigration Judge relied on the testimony of Todd Gardner, a Special Assistant with the Refugee Affairs Division of the United States Citizenship and Immigration Services.  He testified that an asylum applicant's failure to disclose police and military service during the Bosnian War would have prevented an appropriate line of inquiry regarding whether the person was barred from refugee status as a persecutor.  He also stated that including this information would have prompted further questioning.  In addition, he opined that the respondent's omission was material insofar as the refugee officers in Bosnia were trained to address issues of human rights in Bosnia with applicants.

The Immigration Judge also relied on the testimony of Richard Butler, a Criminal Research Specialist at the Human Rights Violator and War Crimes Unit of Immigration and Customs Enforcement.[10]  Mr. Butler asserted that if an individual admitted to being a member of the police or military during the Bosnian War, his application would have been set aside for further review.

The respondent argues that because service with the army of the Republic of Srpska was not "in and of itself a ground of inadmissibility," any misrepresentation regarding such service is not material.  However, the "natural tendency" standard is not so stringent.  In *Kungys*, for example, the Court concluded that while the alien's true date and place of birth were not directly relevant to his citizenship application, they would have a "natural tendency" to influence the determination, even if they only "disclosed other facts relevant to his qualifications."  *Kungys*, 485 U.S. at 774.

The evidence is much stronger here than in *Matter of Bosuego*, where the Government conceded that the alien's admission as a nonimmigrant would not have been denied based on the misrepresented facts alone.  In that case, we determined that the record contained "no reference whatever to other pertinent factors" that would have influenced the consul's determination, and no attempt was made to "develop the relevant facts in existence when the respondent presented herself before the consul."  *Matter of Bosuego*, 17 I&N Dec. at 128.

Accordingly, we conclude that the Immigration Judge made proper factual findings to determine that the respondent's service in the Special Police would have had a "natural tendency" to influence the decision of the local asylum officers to approve his application.  The omission shut off a line of inquiry relevant to the respondent's eligibility for asylum.  As the Immigration Judge found, if the respondent had revealed his service in the

---

[10]  Mr. Butler worked at the International Criminal Tribunal for the former Yugoslavia from 1997 to 2003.  His work focused on the Srebrenica Massacre.

Special Police, the resulting line of questioning would predictably have disclosed his involvement in the Bosnian conflict and his activities as a platoon leader, facts that are clearly relevant to his eligibility for asylum.

Further, the respondent was given ample opportunity to establish that he would have been admissible had the facts been disclosed. He was able to cross-examine both Mr. Butler and Mr. Gardner and to present his own testimony and evidence at the hearing. Both he and his daughter testified. The respondent did not produce evidence to rebut a showing by the DHS that his Special Police service was material to his asylum application. Thus, we conclude that he willfully made a material misrepresentation in procuring admission into the United States. The respondent is therefore inadmissible under section 212(a)(6)(C)(i) of the Act and removable under section 237(a)(1)(A).[11]

## B. Extrajudicial Killing

Under section 212(a)(3)(E)(iii)(II) of the Act, an alien is inadmissible" if he or she has "committed, ordered, incited, assisted, or otherwise participated in the commission of . . . under color of law of any foreign nation, any extrajudicial killing, as defined in section 3(a) of the Torture Victim Protection Act of 1991."[12]

The respondent admitted that he was the leader of the third platoon in the 2nd Company Special Police Brigade of the Jahorina Training Center during July 1995. The 2nd Company was led by Nedjo Ikonic. About 25 Special Police officers served under the respondent's command. His duties included

---

[11] Moreover, as the Immigration Judge found, even under the *Forbes* standard, the respondent's omission was material. In addition to the fact that the misrepresentation had a natural tendency to shut off a line of inquiry as to his activities during the Bosnian War, there is sufficient evidence to raise a "fair inference" that if the respondent had disclosed the extent of his participation in the Special Police, his asylum application would have been denied. As the Immigration Judge found, at the time the respondent applied for refugee status in 1999, the statutory language precluded such status for those determined to have persecuted others or committed genocide. Thus, our result would be the same if we followed *Forbes* and did not apply the principles of *Chevron* and *Brand X* in this case.

[12] For purposes of this section, the term "extrajudicial killing" is defined as

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

Torture Victim Protection Act of 1991, Pub. L. No. 102-256, § 3(a), 106 Stat. 73, 73 (1992).

being a dog training instructor and training police officers to secure or guard roads and regulate traffic. His platoon was ordered to secure and guard the Konjevic Polje road at some point after July 12, 1995. The road was a key escape route for Bosnians during this period of the war.[13] On July 13, about 1,000 Bosnian men and boys surrendered to the respondent's platoon along the road. They were then taken by convoy to a warehouse approximately 2 miles away in Kravica and killed. Mr. Butler testified he believed that on July 13, 1995, members of the respondent's platoon under his command captured prisoners who were later executed, but the respondent denies being present for this event.

On July 16 or 17, 1995, the 2nd Company, including the respondent's platoon, and two army units were ordered to perform a "sweep" of the area around the road, during which another 200 men were captured or surrendered. The respondent admitted that he was present when the men surrendered. He also admitted that the men were left with him and Nedjo Ikonic for approximately 30 minutes before being loaded onto buses. Dusko Jevic, the commander of the Jahorina Training Center, testified at the respondent's removal hearing. He stated that he was responsible for the transportation of the men and that those under his command, including the respondent's platoon, actually loaded the men onto the buses. The men were taken away and killed.

In remanding this case, the Ninth Circuit found that we did not apply the court's two-part test set forth in *Miranda Alvarado v. Gonzales*, 449 F.3d 915 (9th Cir. 2006), for determining whether an alien had "assisted" in persecution under the "similarly worded" provisions known as the "persecutor bar" to asylum.[14] *Radojkovic*, 599 F. App'x at 648. The court remanded "for further clarification regarding the relevance and applicability of the two-prong test established by *Miranda Alvarado*." *Id.*

## 1. *Miranda Alvarado*

The alien in *Miranda Alvarado* served as a language interpreter in Peru for interrogations of suspected Shining Path members. *Miranda Alvarado*, 449 F.3d at 918. During these interrogations, the suspects were often

---

[13] The respondent does not appeal the finding that he and the Special Police Brigade were acting "under color of law" during the relevant events. *See Matter of D-R-*, 25 I&N Dec. at 452.

[14] Under sections 101(a)(42) and 208(b)(2)(A)(i) of the Act, 8 U.S.C. §§ 1101(a)(42) and 1158(b)(2)(A)(i) (2012), an individual who has "ordered, incited, assisted, or otherwise participated in the persecution of any person" based on a protected ground is ineligible for asylum. These provisions are known as the "persecutor bar" to asylum. *Matter of M-B-C-*, 27 I&N Dec. 31, 38 (BIA 2017).

tortured, and he witnessed the torturous acts.  He performed these interpreter services two to three times a month from 1982 to 1988.  *Id.*  The Immigration Judge denied his application for asylum because he "assisted in the persecution of others."  *Id.* at 920.

The Ninth Circuit determined that the statute did not define, in unambiguous terms, what is meant by "'assist[ing], or otherwise participat[ing]' in the persecution of others."  *Id.* at 921 (alterations in original).  However, it declined to apply *Chevron* deference to our decision because we had affirmed the Immigration Judge's decision, rather than issuing an opinion that had "the force of law."  *Id.* at 921–24.  The court acknowledged that the Attorney General had subsequently issued a precedential opinion concerning the persecutor bar.  *Id.* at 923 n.4 (citing *Matter of A-H-*, 23 I&N Dec. 774 (A.G. 2005), *remanded on other grounds*, *Haddam v. Holder*, 547 F. App'x 306 (4th Cir. 2013)).  It nevertheless found that the "factual posture" of that case made it distinguishable and that "the more general principles" enunciated by the Attorney General were "fully consistent with" prior Ninth Circuit case law.  *Id.*

The court then ruled that determining whether an alien assisted in persecution, "requires a particularized evaluation of both *personal involvement and purposeful assistance* in order to ascertain culpability."  *Id.* at 927 (emphasis added).  It looked to a footnote in *Fedorenko*, which "has since become the principal guide to interpreting persecutor exceptions generally."  *Id.* at 925.  In that footnote, the Supreme Court stated:

> [A]n individual who did no more than cut the hair of female inmates before they were executed cannot be found to have assisted in the persecution of civilians.  On the other hand, there can be no question that a guard who was issued a uniform and armed with a rifle and a pistol, who was paid a stipend and was regularly allowed to leave the concentration camp to visit a nearby village, and who admitted to shooting at escaping inmates on orders from the commandant of the camp, fits within the statutory language about persons who assisted in the persecution of civilians.

*Id.* at 925–26 (quoting *Fedorenko*, 449 U.S. at 512 n.34).  The Ninth Circuit concluded that this footnote "indicated *a continuum of conduct* against which an individual's actions must be evaluated so as to determine personal culpability."  *Id.* at 926 (emphasis added).

According to the court, in evaluating an alien's conduct, it is necessary to examine "the degree of relation [the alien's] acts had to the persecution itself," including whether the alien acted in self-defense, how long a period of time the alien was involved in the acts, and what threats were used to compel assistance.  *Id*. at 926–28.  The court explained that its standard "does not require actual 'trigger-pulling'" by the alien.  *Id.* at 927 (quoting *Matter of A-H-*, 23 I&N Dec. at 784).  With regard to the other end of the continuum,

the court stated that an alien's "'[m]ere acquiescence or membership in an organization' is insufficient to satisfy the persecutor exception." *Id.* (quoting *Vukmirovic v. Ashcroft*, 362 F.3d 1247, 1252 (9th Cir. 2004)).

The Ninth Circuit concluded that Miranda Alvarado had assisted in persecution because his "services were integral" to the persecution that occurred. *Id.* at 929. In reaching that determination, the court cited the Immigration Judge's finding that without the alien's services as an interpreter, "the interrogations could not proceed." *Id.* at 928.

### 2. "Assisted, or Otherwise Participated in"

As the Ninth Circuit has recognized, the Act does not "spell out what is meant by" the phrase "assisted, or otherwise participated in." *Id.* at 921. Our survey of the Federal circuit court decisions reveals that interpretations of the phrase vary. However, there is some consensus that the Government must show evidence of (1) a nexus between an alien's acts and the persecution or extrajudicial killing and (2) the alien's scienter, or prior or contemporaneous knowledge of the effect of his actions. *See Quitanilla v. Holder*, 758 F.3d 570, 577 (4th Cir. 2014); *Abdallahi v. Holder*, 690 F.3d 467, 476 (6th Cir. 2012); *cf. Suzhen Meng v. Holder*, 770 F.3d 1071, 1074 (2d Cir. 2014).[15] Other circuits have not created a clear standard.[16]

We conclude that the phrase "assisted, or otherwise participated in" under section 212(a)(3)(E)(iii) of the Act is ambiguous. For the following reasons, we decline to apply the standard outlined in *Miranda Alvarado* and will,

---

[15] Unlike other circuits, the Second Circuit has outlined a four-part test for determining when the persecutor bar applies. Under that test, (1) "the alien must have been involved in acts of persecution"; (2) a "nexus must be shown between the persecution" and an enumerated ground; (3) if the alien "did not incite, order, or actively carry out" the persecution, then his or her conduct "must have 'assisted' the persecution"; and (4) "the alien must have sufficient knowledge that his or her actions may assist in persecution to make those actions culpable." *Balachova v. Mukasey*, 547 F.3d 374, 384–85 (2d Cir. 2008). In defining "assistance," the court has contrasted conduct that is "'passive in nature' and 'tangential' to third-party acts of oppression," with "'active' conduct, having 'direct consequences for the victims.'" *Suzhen Meng*, 770 F.3d at 1075 (quoting *Zhang Jian Xie v. INS*, 434 F.3d 136, 143 (2d Cir. 2006)); *accord Chen v. Att'y Gen. of U.S.*, 622 F. App'x 155, 161–62 (3d Cir. 2015). The Eleventh Circuit has also ruled that the alien's actions must be "active, direct and integral to the underlying persecution." *Chen v. U.S. Att'y Gen.*, 513 F.3d 1255, 1259 (11th Cir. 2008).

[16] The Eighth Circuit requires a "particularized evaluation" of the circumstances. *Hernandez v. Reno*, 258 F.3d 806, 813 (8th Cir. 2001) (citing *Fedorenko*, 449 U.S. at 512 n.34); *see also Singh v. Gonzales*, 417 F.3d 736, 739 (7th Cir. 2005) (noting that "a distinction must be made between genuine assistance in persecution and inconsequential association with persecutors").

instead, exercise our authority to provide guidance on the definition of the term pursuant to *Chevron* and *Brand X*.[17]

In constructing our standard, we begin by adopting the generally accepted premise, stated in *Fedorenko*, that there exists a "continuum of conduct against which an individual's actions must be evaluated" in determining whether he "assisted, or otherwise participated in" extrajudicial killing. *Miranda Alvarado*, 449 F.3d at 926.[18]

We then look to the Attorney General's decision in *Matter of A-H-*, 23 I&N Dec. at 783−85, which remains relevant precedent and sets forth some general principles for defining the phrase "assisted, or otherwise participated in" under the Act.[19] The Attorney General quoted the dictionary in stating that "[t]o 'assist' means 'to give support or aid: help'" and "to 'participate' means 'to take part in something (as an enterprise or activity) usu[ally] in common with others." *Id.* at 784. Surveying relevant case law, he further concluded that "these terms are to be given broad application." *Id.* Finally, he found it appropriate to look at the "totality of the relevant conduct in determining whether the bar to eligibility applies." *Id.* at 785.[20]

---

[17] As previously noted, the definition of the term "assisted, or otherwise participated in" can be applied in the context of the persecutor bar, as well as in this context. *See* sections 101(a)(42), 208(b)(2)(A)(i) of the Act; *Radojkovic*, 599 F. App'x at 648. The phrase is also found in the exceptions to eligibility for withholding of removal under the Act. Section 241(b)(3)(B)(i) of the Act, 8 U.S.C. § 1231(b)(3)(B)(i) (2012); *see also Matter of J.M. Alvarado*, 27 I&N Dec. 27, 27 (BIA 2017).

[18] The Ninth Circuit also considered whether the alien acted in self-defense and whether threats were used to compel his assistance. *Miranda Alvarado*, 449 F.3d at 926–29. However, the respondent did not present any evidence of duress in these proceedings, and we do not now address whether there is a "duress" exception to any of the applicable standards. *See Negusie v. Holder*, 555 U.S. 511, 522–24 (2009) (remanding for a decision whether the persecutor bar contains a duress exception).

[19] In *Haddam*, 547 F. App'x at 313, which remanded *Matter of A-H-* on other grounds, the Fourth Circuit expressed concern about the implication that verbal approval of an act after the fact, or subsequent membership in a group that had committed atrocities, would be sufficient to establish assistance or participation in persecution. The court concluded that "the persecutor bar only applies in cases where there is a causal nexus between the [alien's] behavior and instances of persecution." *Id.* at 310.

[20] In *Matter of D-R-*, 25 I&N Dec. at 454–55, we relied on these guidelines and ultimately based on our decision on a set of factors, including the respondent's "command responsibility, his presence, his platoon's active participation, and the finding that he must have been aware that mass killings of other similarly situated Bosnian Muslims were ongoing at this time, particularly the nearby mass execution at the Kravica warehouse several days earlier." Addressing the respondent's "command responsibility," we quoted the relevant language in the United States Senate Report for the proposed Anti-Atrocity Alien Deportation Act of 2003, S.710, 108th Cong. (2003), which explained the role of command authority as a form of assistance or participation in persecution. *Id.* at 452–53.

We conclude that in constructing a more specific test for determining an alien's assistance and participation, the most practical and useful standard is one that considers (1) the nexus between the alien's role, acts, or inaction, and the extrajudicial killing; and (2) his scienter, meaning his prior or contemporaneous knowledge of the killing.

In regard to nexus, we agree with the Ninth Circuit that if the alien did not have "direct personal involvement," an important factor is "the degree of relation [the alien's] acts had to the persecution itself." *Miranda Alvarado*, 449 F.3d at 927−28. It is less helpful to contrast "active" with "passive" participation, because there appears to be a general understanding that some conduct that can be viewed as "passive," like guarding prisoners, is sufficient assistance or participation. Rather, we look at whether the alien's role was material or integral to the killing—or, as the DHS argues, whether the alien's role "contributed" to the ultimate harm. We also agree with the Ninth Circuit's ruling that "'[m]ere acquiescence or membership in an organization' is insufficient" to establish culpability. *Id.* at 927 (citation omitted).

Scienter also plays a role in many of the Federal circuit decisions on the issue. The Ninth Circuit did not discuss scienter in *Miranda Alvarado*, but the alien in that case was present in the room during the persecution.[21] We agree with the Fourth and Second Circuits that "the evidence need not show that the alleged persecutor had specific actual knowledge that his actions assisted in a particular act of [extrajudicial killing]." *Quitanilla*, 758 F.3d at 577 (quoting *Xu Sheng Gao v. U.S. Att'y Gen.*, 500 F.3d 93, 103 (2d Cir. 2007)). Rather, "the alien must have had 'sufficient knowledge that [his or] her actions may assist in [extrajudicial killing] to make those actions culpable.'" *Suzhen Meng*, 770 F.3d at 1074 (citation omitted). Thus, direct proof of actual knowledge is not required. Instead, the alien must have sufficient knowledge that the consequences of his actions may assist in acts

---

[21] The progeny of *Miranda Alvarado* have considered an alien's scienter when considering the culpability of those who are physically removed from the persecutory acts. *See, e.g.*, *Angel v. Lynch*, 637 F. App'x 397, 398 (9th Cir 2016) ("He arrested guerrillas and conducted initial interviews with them; he then turned the guerrillas over to his superiors, knowing his superiors would torture them."); *Aguilar v. Lynch*, 621 F. App'x 443, 444–45 (9th Cir. 2015) (concluding that the alien knew "that one of the targets of his surveillance disappeared and is presumed dead. . . . [He] also heard his superiors order task force members to torture someone whom the task force had abducted. This level of knowledge and participation establishes the degree of 'individual accountability' required to affirm the [Board's] determination."); *Ochoa v. Holder*, 340 F. App'x 420, 422 (9th Cir. 2009) ("As a Guatemalan police officer, [the alien] arrested individuals knowing that some of them would be tortured. Further, he recorded statements from detainees who had been tortured, and whose statements were given as a result of this torture.").

of extrajudicial killing. The fact finder may look to direct or circumstantial evidence in the record to determine whether the alien had sufficient knowledge that his conduct may have assisted acts of extrajudicial killing.[22]

None of the above disturbs our discussion of "command responsibility" in *Matter of D-R-* or our subsequent decision in *Matter of Vides-Casanova*, 26 I&N Dec. 494 (BIA 2015). An individual in a position of authority over the perpetrators of extrajudicial killing or persecution, such as a military commander, may be held accountable for failure to prevent his subordinates from committing such acts. A person with command responsibility may also be responsible for any failure to investigate or punish his subordinates when the evidence demonstrates that he knew they were involved. However, in analyzing the respondent's assistance and participation in the extrajudicial killings in this case, we need not rely on his command responsibility to support our decision.

### 3. Application to the Respondent

The respondent admitted that he and his unit were stationed at the road near Konjevic Polje during the relevant days in July 1995. The Immigration Judge did not clearly err in finding that the respondent's Special Police unit was under the control of the military of the Republic of Srpska during that mission with Ikonic's company.

The mission of the respondent's platoon was to "secure" the road, and they conducted at least one "sweep" on July 16 or 17, which resulted in the capture or surrender of about 200 Bosnian Muslim men. The respondent admitted that the men were left with him and Nedjo Ikonic for approximately 30 minutes before being loaded on to buses. The Immigration Judge found that the record supported a conclusion that the respondent assisted in loading those individuals onto the buses. The respondent's attorney stipulated that the 200 men captured on that day were killed.

There is a sufficient nexus between the actions of the respondent and the extrajudicial killings. Although he was not present when the Bosnian Muslims who were captured by his unit were killed, he had custody of the men and assisted in loading them onto the buses that would take them to their deaths. Our conclusion is consistent with court decisions examining similar circumstances. For example, the Fourth Circuit decided that the persecutor bar applied to a sergeant who "oversaw the investigation and capture of twenty to fifty civilians and guerillas [and] then turned those captives over to his military superiors, where the prisoners were, according to the country reports, 'routinely interrogated, tortured and sometimes killed.'"

---

[22] A persecutor's knowledge of the consequences of his actions is not excused if he or she is willfully blind to the facts and circumstances.

*Quitanilla*, 758 F.3d at 577. In so ruling, the court noted that "those who take custody of or transport individuals for the purpose of persecution may be subject to the persecutor bar." *Id.* (citing *Xie v. INS*, 434 F.3d 136, 143 (2d Cir. 2006)); *see also Singh v. Gonzales*, 417 F.3d 736, 740 (7th Cir. 2005) ("For his part, [the alien] took innocent Sikhs into custody during that period and transported them to the police station, where he knew they would be subjected to unjustified physical abuse.").

The respondent's role in these killings appears more direct than that of the alien in *Miranda Alvarado*. As the Ninth Circuit noted,

> Miranda was not in a position of authority with regard to planning or inciting the interrogations; he did not directly apply the electric shocks or beatings; he did not supply the physical compulsion that allowed the torture to occur, as do armed guards; and he *did not, forcibly or otherwise*, *arrest the victims or bring them* to the place of torture.

*Miranda Alvarado*, 449 F.3d at 929 (emphasis added).

The respondent also had the requisite scienter—or prior or contemporaneous knowledge—that the 200 Muslim men were being transported to their deaths. While the respondent claimed that he was never in Kravica and did not know anything about the prior transportation of captured Bosnians and their killings, the Immigration Judge concluded that his claim was implausible based on the other evidence in the record. We find no clear error in this determination.[23]

We adopt and incorporate our determinations in Part II, section B, of *Matter of D-R-*, 25 I&N Dec. at 451−56, concerning the Immigration Judge's factual findings on this issue. For example, Mr. Butler testified that when the sweep on July 16 or 17 took place, it was already known that the Serbian military and Special Police were carrying out mass executions of Bosnian Muslims and that other military police had admitted having such knowledge. Moreover, the written evidence demonstrates that those posted on the Konjevic Polje road would have been aware not only of the transport of prisoners to mass executions because of troop movements and buses along the road but also of the killings at the nearby Kravica warehouse. Additionally, there is evidence that noncombatants were killed on the spot when they emerged from the woods bordering the road.

---

[23] The respondent continues to assert on remand that when the "100 to 200 Bosnian Moslems armed with weapons and dressed as soldiers[] surrendered to the three units under the command of Nedjo Ikonic" (including his unit), he and his colleagues "called the military to ask what to do with the prisoners," and "the military arrived in buses several hours later and took away the soldiers who had surrendered." The respondent further asserts that "[s]everal days later and unbeknownst to [him], it is believed that the Moslems were killed by the military."

The Immigration Judge made reasonable inferences from the totality of the record to conclude that the respondent assisted in the commission of extrajudicial killings because he had sufficient knowledge that the 200 Bosnian Muslims would be killed unlawfully. That determination was based on the respondent's role, responsibilities, and actions at the time. Thus, the Immigration Judge did not clearly err in making these factual findings. *See Matter of J-B-N- & S-M-*, 24 I&N Dec. 208, 215 (BIA 2007) (finding no clear error in the Immigration Judge's fact-finding as to alleged persecutors' motives); *Matter of S-P-*, 21 I&N Dec. 486, 490 (BIA 1996) (noting that the motivation of the persecutor "involves questions of fact").[24] We therefore reaffirm the Immigration Judge's determination that the respondent is removable under section 237(a)(4)(D) of the Act.

## III. CONCLUSION

The respondent is inadmissible under section 212(a)(6)(C)(i) of the Act because his failure to disclose that he was a Special Police officer during the Bosnian War on his application for refugee status was a misrepresentation of a material fact that tended to shut off a line of inquiry relevant to his eligibility for asylum. He is also removable under section 237(a)(4)(D) of the Act because he assisted or otherwise participated in extrajudicial killings under section 212(a)(3)(E)(iii)(II). The Immigration Judge therefore properly ordered his removal from the United States. Accordingly, the respondent's appeal will be dismissed.

**ORDER:** The appeal is dismissed.

---

[24] The result would be the same under the Ninth Circuit's *Miranda Alvarado* standard. The respondent had the requisite "personal involvement," because his platoon accepted the surrender of the 200 men, he had physical custody over them, and he assisted in loading them on to the buses. He also demonstrated "purposeful assistance" since his actions were material to the extrajudicial killing of those men. *See Kumar v. Holder*, 728 F.3d 993, 998–99 (9th Cir. 2013) ("Regarding the first factor of *Miranda Alvarado*, personal involvement in alleged persecution, we examine whether the [alien's] involvement was active or passive. . . . Second, to determine whether the [alien] purposefully assisted in the alleged persecution, we examine whether [his] acts were material to the persecutory end.").