# Matter of Daniel Girmai NEGUSIE, Applicant

*Decided June 28, 2018*

U.S. Department of Justice
Executive Office for Immigration Review
Board of Immigration Appeals

(1)  An applicant who is subject to being barred from establishing eligibility for asylum or withholding of removal based on the persecution of others may claim a duress defense, which is limited in nature.

(2)  To meet the minimum threshold requirements of the duress defense to the persecutor bar, an applicant must establish by a preponderance of the evidence that (1) he acted under an imminent threat of death or serious bodily injury to himself or others; (2) he reasonably believed that the threatened harm would be carried out unless he acted or refrained from acting; (3) he had no reasonable opportunity to escape or otherwise frustrate the threat; (4) he did not place himself in a situation in which he knew or reasonably should have known that he would likely be forced to act or refrain from acting; and (5) he knew or reasonably should have known that the harm he inflicted was not greater than the threatened harm to himself or others.

FOR APPLICANT:  Andrew J. Pincus, Esquire, Washington, D.C.

FOR THE DEPARTMENT OF HOMELAND SECURITY:  George R. Martin, Associate Legal Advisor

BEFORE:  Board Panel:  GRANT and GREER, Board Members.  Concurring and Dissenting Opinion:  MALPHRUS, Board Member.

GRANT, Board Member:

In a decision dated May 31, 2005, an Immigration Judge denied the applicant's applications for asylum and withholding of removal but granted his request for deferral of removal under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture"). On February 7, 2006, we dismissed the appeals of both the applicant and the Department of Homeland Security ("DHS").[1]  This case is now before us on remand pursuant to a decision of the United States Supreme Court in

---

[1]   The DHS does not now challenge the applicant's grant of deferral of removal under the Convention Against Torture.

*Negusie v. Holder*, 555 U.S. 511 (2009).  Having reviewed the record and the arguments presented by the parties and amici curiae, we will again dismiss the applicant's appeal.[2]

We conclude that duress is relevant in determining whether an alien who assisted or otherwise participated in persecution is prevented by the so-called "persecutor bar" from establishing eligibility for asylum and withholding of removal under sections 101(a)(42), 208(b)(2)(A)(i), and 241(b)(3)(B)(i) of the Immigration and Nationality Act, 8 U.S.C. §§ 1101(a)(42), 1158(b)(2)(A)(i), and 1231(b)(3)(B)(i) (2012), and for withholding of removal under the Convention Against Torture pursuant to 8 C.F.R. § 1208.16(c) and (d)(2) (2018).[3]  In this decision, we set forth a standard for evaluating claims of duress in this context.  Applying that standard to the uncontested findings of fact in the record, we conclude that the applicant has not established that he was under duress when he assisted in the persecution of prisoners who were persecuted under his guard in an Eritrean prison camp.

## I.  FACTUAL AND PROCEDURAL HISTORY

The applicant is a national and citizen of both Ethiopia and Eritrea.  He arrived in the United States on December 20, 2004, as a stowaway.  Once in this country, he claimed that he would be persecuted upon his return and applied for asylum and withholding of removal.

At a credible fear interview, the applicant testified that he had been forcefully conscripted into the Eritrean military.  As a result of his refusal to fight against fellow Ethiopians, he was incarcerated for 2 years, subjected to forced labor, beaten, and exposed to the hot sun.  Thereafter, he was forced to serve as a uniformed and armed guard at a prison camp operated by the Eritrean military.  His duties included guarding prisoners to make sure they did not escape and keeping prisoners from taking showers and obtaining fresh air.  At times, he guarded prisoners who were placed in the hot sun as a form of punishment and saw at least one man die after being in the sun for more than 2 hours.  On at least two occasions, the applicant disobeyed orders and assisted prisoners, for which he received verbal reprimands from his

---

[2]  On September 8, 2017, a three-member panel of the Board heard oral argument from both parties.  We acknowledge and appreciate the briefs submitted by the parties and amici curiae.

[3]  The "persecutor bar" is set forth in in the definition of a "refugee" in section 101(a)(42) of the Act, which provides, in pertinent part:  "The term 'refugee' does not include any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion."  The same language bars aliens from establishing eligibility for asylum and withholding of removal under the Act and the Convention Against Torture.

superiors but was not harmed or threatened with physical harm. The applicant escaped from the prison and hid in a container that was loaded on board a ship heading to the United States. His claim of persecution is based on his assertion that prison guards harmed him on account of a protected ground while he was a prisoner.

Following his credible fear interview, the applicant was issued a Notice of Referral to Immigration Judge (Form I-863). In a decision dated May 31, 2005, the Immigration Judge determined that the persecutor bar applied to the applicant because he guarded prisoners who were tortured and left to die in the hot sun on account of a protected ground. Thus, the Immigration Judge concluded that the applicant was ineligible for asylum and withholding of removal as one who has assisted in the persecution of others on account of race, religion, nationality, membership in a particular social group, or political opinion. However, finding that the applicant was credible and that it is more likely than not that he would be arrested and tortured by the Eritrean Government upon return to Eritrea because he is a military deserter, the Immigration Judge granted his request for deferral of removal under the Convention Against Torture pursuant to 8 C.F.R. § 1208.17 (2005). Both the applicant and the DHS appealed.

We dismissed the applicant's appeal, affirming the Immigration Judge's finding that the applicant is subject to the persecutor bar. Based primarily on our decision in *Matter of Fedorenko*, 19 I&N Dec. 57, 69 (BIA 1984), and *Fedorenko v. United States*, 449 U.S. 490 (1981), we determined that it was immaterial that the applicant was compelled to act as a prison guard and concluded that an alien's motivation and intent are irrelevant to whether he "assisted" or "participated" in persecution. The United States Court of Appeals for the Fifth Circuit affirmed our decision following the same reasoning. *Negusie v. Gonzales*, 231 F. App'x 325 (5th Cir. 2007).

The Supreme Court reversed and remanded. The Court first held that the persecutor bar's silence with regard to a duress exception "is not conclusive" and that on this precise point, the statute is ambiguous. *Negusie*, 555 U.S. at 518. The Court held that the Board and the Fifth Circuit erred in concluding that *Fedorenko* is controlling on the question because, in that case, the Court was interpreting the Displaced Persons Act of 1948, ch. 647, 62 Stat. 1009, which is distinct in purpose and language from the statute at issue here, the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 ("Refugee Act"). *Negusie*, 555 U.S. at 518–20.

The Court emphasized the distinction between the DPA, which was enacted to address not only the post-World War II refugee crisis "but also the Holocaust and its horror," and the Refugee Act, which was "designed to provide a general rule for the ongoing treatment of all refugees and displaced persons." *Id.* at 520. Since *Fedorenko* addressed "a different statute enacted

for a different purpose," it does not control interpretation of the persecutor bar in the Refugee Act. *Id.* The Court also recognized that it is not "clear that Congress had an intention on the precise question at issue." *Id.* at 518. Finding that the Board "has not exercised its interpretive authority" on the question, *id.* at 522, the Court remanded for us to make a "determination of the statutory interpretation question," *id.* at 524, "with respect to whether an alien who was coerced to assist in persecution is barred from obtaining asylum in the United States," *id.* at 525 (Scalia, J., concurring).

## II. ARGUMENTS OF THE PARTIES

Both parties rely on the legislative history, the international instruments, and other provisions of the Act to reach opposite conclusions. The parties' arguments are similar to those considered by the Supreme Court, and both positions have merit. We will summarize the most salient points.

The DHS maintains that neither the 1967 United Nations Protocol Relating to the Status of Refugees, *opened for signature* Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 (entered into force Oct. 4, 1967; for the United States Nov. 1, 1968) ("Protocol"), nor the 1951 United Nations Convention Relating to the Status of Refugees, *adopted* July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 (entered into force Apr. 22, 1954) ("Convention"), indicates that the persecutor bar in the Act should be read to incorporate a duress exception. This is particularly so in regard to Article 1F of the Convention, which identifies persons who are ineligible for protection under the Convention (referred to as the "Exclusion Clauses").

While acknowledging that the Board may examine the treaty obligations that inform the Act, the DHS argues that the Board has no authority to expand our obligations beyond that which has been provided by the Act and regulations. *See Matter of G-K-*, 26 I&N Dec. 88, 93 (BIA 2013). Relying on the fact that Congress did not provide an explicit duress exception or make intent an element for establishing culpability under the persecutor bar, the DHS contends that the Board should be "reluctant" to construe the ambiguous persecutor bar as providing such an exception. According to the DHS, if the Board were to recognize a duress exception, it "would risk effectively expanding U.S. treaty obligations beyond what the President and Congress intended." The DHS emphasizes that the drafting history of Article 1F of the Convention establishes that each State party was free to make its own decision regarding how the Exclusion Clauses are to be applied and that rejection of a duress exception does not mean that a State is in violation of its treaty obligations.

The DHS further argues that even a narrowly crafted duress exception would create a high risk of erroneous determinations, undermine the Act's

grounds of removability related to human rights, add significant caseload burdens to the Immigration Courts, and even require overseas investigations to assess the veracity of an applicant's claim of duress. Although the Supreme Court rejected the proposition that its decision in *Fedorenko* resolves the statutory ambiguity in the persecutor bar, the DHS contends that *Fedorenko* and our interpretation of the Holtzman Amendment in *Matter of Laipenieks*, 18 I&N Dec. 433, 464 (BIA 1983), *rev'd*, 750 F.2d 1427 (9th Cir. 1985), remain highly persuasive authority on the question of a duress exception.[4] The DHS acknowledges that "declining to read an implicit duress exception into the persecutor bar . . . would carry significant implications," namely, the denial of relief to applicants who were compelled to engage in the persecution of others and who may have "endured unimaginable harm themselves." However, the DHS contends that the same consequence flowed from the Supreme Court's decision in *Fedorenko* that the nation has a legitimate interest in not providing safe haven to violators of human rights or importing "ethnic strife" from other countries. *Negusie*, 555 U.S. at 527 (Scalia, J., concurring). Accordingly, the DHS argues for a "bright-line" persecutor bar that prohibits any exception.

For his part, the applicant contends that the only permissible interpretation of the persecutor bar must reflect the principle that persons should not suffer serious adverse consequences for acts committed under duress. The applicant argues that this principle is reflected in the Exclusion Clauses of the Convention, which are couched in the language of criminal violations. Thus, he asserts that the Exclusion Clauses necessarily import the requirement that individual responsibility must be established before a ground of exclusion may be applied.

According to the applicant, since Congress manifestly intended that the provisions of the Refugee Act should be interpreted in light of these treaty obligations, a duress exception commensurate with this principle must be

---

[4] The Holtzman Amendment, Pub. L. No. 95-549, §§ 101, 103, 92 Stat. 2065, 2065–66 (1978), amended the Act to provide for the exclusion and deportation of any alien associated with the Nazi forces who "ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion." *See* former sections 212(a)(33), 241(a)(19) of the Act, 8 U.S.C. §§ 1182(a)(33), 1251(a)(19) (Supp. II 1978) (recodified at sections 212(a)(3)(E), 237(a)(4)(D) of the Act, 8 U.S.C. §§ 1182(a)(3)(E), 1227(a)(4)(D) (2012)); *see also* former section 243(h) of the Act, 8 U.S.C. § 1253(h) (Supp. II 1978) (including the persecutor bar language for withholding of deportation). According to the Supreme Court, the Board "has not exercised its interpretive authority but, instead, has determined that *Fedorenko* controls." *Negusie*, 555 U.S. at 522. While the DHS contends that the Board did perform a "limited statutory analysis" of the Holtzman Amendment in *Laipenieks*, we follow the Court's assessment of our decision.

recognized.[5]  Failure to do so risks excluding from protection the victims of a "commonplace" form of persecution in the contemporary world—forcing those who are victims of persecution themselves to persecute others. Examples include child soldiers forcibly recruited from victim populations, individuals tortured to identify the names of others with similarly disfavored political views, and victims of widespread religious persecution.  The applicant discounts the administrative burdens of applying a duress exception, noting that the difficulties are similar to those already encountered in litigating and adjudicating claims of persecution.  In this case, the applicant contends that he plainly acted under duress, noting the execution of two friends who tried to escape duty as prison camp guards and the threats of death he personally received.

Against this background, in which the parties' respective arguments cut both ways, the Supreme Court has indicated that we can recognize a duress exception, provided that doing so is reasonable.  We conclude that it is eminently reasonable to recognize a narrow duress exception to the persecutor bar.  While Congress' expression of its explicit intent would be preferable, the lack of it in the intervening years since the Supreme Court provided its direction in *Negusie* does not prevent us from making an exception based on traditional tools of statutory construction and common sense.  Indeed, the Court observed that filling the statutory gap "involves difficult policy choices that agencies are better equipped to make than courts."  *Negusie*, 555 U.S. at 523 (citation omitted) (internal quotation mark omitted).

Furthermore, the experience of our own courts, as well as tribunals in sister jurisdictions that also adhere to the Convention and Protocol, demonstrates that such claims are justiciable, both in theory and practice. Moreover, any anticipated difficulty in applying a duress exception should not prevent us from recognizing a narrow exception that will continue to protect those found to have assisted or participated in acts of persecution for which they bear no culpability.  The added burden would be one of degree, not of kind, in light of what we and the Immigration Courts routinely face in the adjudication of claims for protection under the Act and the Convention Against Torture.[6]

---

[5]  The applicant contends that the text of the persecutor bar "unambiguously" provides for a duress exception.  So phrased, this argument is foreclosed by the Supreme Court's determination that the statutory text is ambiguous on this point.  At oral argument, counsel for the applicant clarified that while the specific text of the persecutor bar may be ambiguous, the context of its enactment leads to only one permissible interpretation.

[6]  In this regard, our conclusion is analogous to that reached by the Attorney General in *Matter of Y-L-, A-G-, & R-S-R-*, 23 I&N Dec. 270, 276 (A.G. 2002), where he determined that he would be "well within [his] discretion to conclude that all drug trafficking offenses

## III. DURESS EXCEPTION

Recognizing a narrow duress exception is reasonable because it fulfills the purposes of the persecutor bar and the overall purposes of the Refugee Act. A narrow duress exception is also consistent with the purposes and implementation of the Convention and Protocol. And it is the best of the permissible approaches. *Negusie*, 555 U.S. at 528 (Scalia, J., concurring) ("It is to agency officials, not to the Members of this Court, that *Congress has given discretion to choose among permissible interpretations of the statute*." (emphasis added)).

### A. Parallel Provisions

We look first to the legislative history of the Refugee Act. *Matter of L-A-C-*, 26 I&N Dec. 516, 518 (BIA 2015) ("Where the statutory language is unclear, we consider legislative history to help discern congressional intent."). It is well established that Congress enacted the Refugee Act to bring United States law into conformity with the Convention and the Protocol. *See Negusie*, 555 U.S. at 520 (citing *INS v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999), and *INS v. Cardoza-Fonseca*, 480 U.S. 421, 436–47 (1987)). The United States agreed to comply with Articles 2 through 34 of the Convention when it acceded to the Protocol in 1968. *See Cardoza-Fonseca*, 480 U.S. at 429; *INS v. Stevic*, 467 U.S. 407, 416 (1984).

The Refugee Act added provisions to the Immigration and Nationality Act that closely correspond to the Protocol and the Convention. The definitions of a "refugee" in the Refugee Act and Article 1A(2) of the Convention are almost identical.[7] The Supreme Court has observed that there were "many statements indicating Congress' intent that the new statutory definition of 'refugee' be interpreted in conformance with the Protocol's definition." *Cardoza-Fonseca*, 480 U.S. at 437. For example, in reporting out its version of the Refugee Act, the House Judiciary Committee

---

are *per se* 'particularly serious crimes' under the [Act]," but he did "not consider it necessary . . . to exclude entirely the possibility of the very rare case where an alien may be able to demonstrate extraordinary and compelling circumstances that justify treating a particular drug trafficking crime as falling short of that standard."

[7] Article 1A(2) of the Convention defines a "refugee" as

> any person who . . . owing to well-founded fear of being persecuted for reasons of race, religion, nationality, membership of a particular social group or political opinion, is outside the country of his nationality and is unable or, owing to such fear, is unwilling to avail himself of the protection of that country.

stated, "All witnesses appearing before the Committee strongly endorsed the new [refugee] definition, which will finally bring United States law into conformity with the internationally-accepted definition of the term 'refugee' set forth in the . . . Convention and the Protocol . . . ." H.R. Rep. No. 96-608, at 9 (1979).

Similarly, section 208(a) of the Act, authorizing a grant of asylum, corresponds to Article 34 of the Convention.[8] *See Cardoza-Fonseca*, 480 U.S. at 441. Former section 243(h) to the Act, 8 U.S.C. § 1253(h) (1994) (now codified as section 241(b)(3) of the Act), which prohibits the removal of an alien to a country where his "life or freedom would be threatened" on account of a protected ground, corresponds to Article 33.1 of the Convention.[9] *See Aguirre-Aguirre*, 526 U.S. at 427 (stating that "the basic withholding provision of [former section 243(h)(1) of the Act] parallels Article 33" of the Convention); *Cardoza-Fonseca*, 480 U.S. at 429, 441.

The Refugee Act, like the Convention, makes certain categories of aliens ineligible for asylum and withholding of deportation. The "refugee" definition itself excludes those who persecute others.[10] Section 203(e) of the Refugee Act, 94 Stat. at 107, added former section 243(h)(2) to the Act, making withholding of deportation unavailable to an alien if

> (A) the alien ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion;
> (B) the alien, having been convicted by a final judgement of a particularly serious crime, constitutes a danger to the community of the United States;
> (C) there are serious reasons for considering that the alien has committed a serious nonpolitical crime outside the United States prior to the arrival of the alien in the United States; or
> (D) there are reasonable grounds for regarding the alien as a danger to the security of the United States.

The House Judiciary Committee explained that these statutory bars "are those provided in the Convention." H.R. Rep. No. 96-608, at 18 ("As with the asylum provision, the Committee feels that the proposed change in

---

[8]　Article 34 provides, in pertinent part: "The Contracting States shall as far as possible facilitate the assimilation and naturalization of refugees."

[9]　Article 33.1 provides: "No Contracting State shall expel or return ('*refouler*') a refugee in any manner whatsoever to the frontiers of territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion."

[10]　The persecutor bar is still codified at section 101(a)(42) of the Act. Aliens who engage in persecution are ineligible for asylum and withholding of removal under sections 208(b)(2)(A)(i) and 241(b)(3)(B)(i) of the Act, respectively.

section 243(h) is necessary so that U.S. statutory law clearly reflects our legal obligations under international agreements.").

These statutory bars correlate to the Article 1F of the Exclusion Clauses, which make Convention protections unavailable to a person if

> (a) he has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes;[11]
> (b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee;
> (c) he has been guilty of acts contrary to the purposes and principles of the United Nations.

Certain provisions of the Act obviously correspond to those in the Convention because the language is the same. For example, the "serious nonpolitical crime" provisions of sections 208(b)(2)(A)(iii) and 241(b)(3)(B)(iii) of the Act correspond to Article 1F(b) of the Convention. *See Aguirre-Aguirre*, 526 U.S. at 427.

Although the language of the persecutor bar is different from the Exclusion Clauses, the legislative history of the Refugee Act shows that it was based on the language of the Protocol and is intended to be interpreted consistent with the Protocol and Convention, specifically, Article 1F(a). *See Matter of J.M. Alvarado*, 27 I&N Dec. 27, 30 n.3 (BIA 2017) (recognizing that Congress considered the persecutor bar to be consistent with the exception under Article 1F(a) of the Convention). In explaining its adoption of the "refugee" definition, the House Judiciary Committee reported that "[t]his is consistent with the U.N. Convention (which does not apply to those who, *inter alia*, 'committed a crime against peace, a war crime, or a crime against humanity')." H.R. Rep. No. 96-608, at 10. Notably, in choosing between language passed by the Senate that merely referred to aliens facing persecution whose deportation would nonetheless "be permitted under the U.N. Convention and Protocol," the Conference Committee opted for the more specific language in the House version of the refugee definition, but "with the understanding that [the House version] is based directly upon the language of the Protocol and it is intended that the provision be construed consistent with the Protocol." H.R. Rep. No. 96-781, at 20 (1980) (Conf. Rep.).

---

[11] Article 1F(a) makes relevant international instruments drawn up since the time of the Convention. *See* U.N. High Commissioner for Refugees, *Background Note on the Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees*, para. 25 (Sept. 4, 2003). For example, crimes against humanity are defined in Article 5 of the Statute of the International Criminal Tribunal for the former Yugoslavia and Article 3 of the Statute of the International Criminal Tribunal for the former Rwanda. *See id.* annex C (listing instruments defining crimes against humanity).

As noted, in 1978 the Holtzman Amendment added the persecutor bar to the withholding of deportation provision at former section 243(h) of the Act and made those who assisted in Nazi persecution inadmissible and deportable. In its report accompanying the bill, the House Judiciary Committee found it unnecessary to define the term "persecution because of race, religion, national origin or political opinion." According to the Committee,

> In applying the 'persecution' provisions of the bill, it is the intention of the committee that determinations be made on a case-by-case basis in accordance with the case law that has developed under the [relevant sections of the Act], *as well as international material on the subject such as the opinions of the Nuremberg tribunals*.

H.R. Rep. No. 95-1452, at 7 (1978) (emphasis added). The Committee specifically referred to international instruments that defined "crimes against humanity" as including "persecution on political, racial or religious grounds." *Id.* at 6; *see also* London Agreement of 8 August 1945 and Charter of the International Military Tribunal ("London Charter") and Control Council Law No. 10 ("Law No. 10"), *in I Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10*, at IX–XII, XVI–XVII (Oct. 1946–Apr. 1949), http://www.loc. gov/rr/frd/Military_Law/NTs_war-criminals.html [hereinafter *Trials of War Criminals*].

This shows that Congress deliberately left terms like "persecution" open to interpretation on a case-by-case basis—and that it specifically endorsed reliance on the referenced international authorities in making these determinations. It also demonstrates a specific awareness by Congress of pre-Convention instruments relevant to the issue of "persecution" and specifically directed that these be applied in making administrative determinations. The Committee acknowledged that consular officers would be required to make "difficult and very delicate determinations" regarding an alien's admissibility but that "[i]t is an accepted precept of international law that 'persecution' is a 'crime against humanity', condemned by all civilized nations." H.R. Rep. No. 95-1452, at 8.

This reinforces our conclusion that Congress intended that the persecutor bar be interpreted in a way that not only comports with our obligations under Article 1F(a) of the Convention but also reflects the international understanding of those obligations. *See Matter of McMullen*, 19 I&N Dec. 90, 97 (BIA 1984) (observing that the provisions under the Act that exclude persons who engage in persecution from asylum and withholding of deportation "parallel and are consistent with the fundamental principles embodied in the" Convention and the Protocol), *aff'd on other grounds*, 788 F.2d 591 (9th Cir. 1986), *overruled in part on other grounds by Barapind v. Enomoto*, 400 F.3d 744, 751 n.7 (9th Cir. 2005) (en banc) (per curiam).

There is no clear indication that Congress intended an interpretation different from those set forth in these international instruments.

## B.  Article 1F(a) of the Convention

Having established that the persecutor bar parallels Article 1F(a) of the Convention and that Congress intended the bar to be interpreted in accord with predecessor instruments to the Convention, we now address whether Article 1F(a) includes a duress exception.  In so doing, we cannot lose sight of the overriding purpose of the Article 1F(a), which is to protect the "integrity of the international refugee regime" by ensuring that those who are undeserving of international protection, in particular war criminals, cannot benefit under the Convention.  James C. Hathaway, *The Michigan Guidelines on the Exclusion of International Criminals*, 35 Mich. J. Int'l L. 3, 7 (2013).

Article 1F(a) excludes persons who have committed "a crime against peace, a war crime, or a crime against humanity" and states that these three crimes are as defined in "international instruments drawn up to make provision in respect of such crimes."  Two such contemporaneous international instruments, the London Charter and the Law No. 10, which were referenced by Congress when enacting the Holtzman Amendment, provide definitions of these crimes.  Both instruments governed the trials of war criminals in Nuremberg, Germany, after World War II.  Under both instruments, "crimes against humanity" include "persecutions on political, racial or religious grounds."

The London Charter established the International Military Tribunal to try major war criminals.  *See I Trials of War Criminals*, *supra*, at XI.  Article 6 of the London Charter defines "crimes against humanity" as

> murder, extermination, enslavement, deportation, and other inhumane acts committed against any civilian population, before or during the war; or persecutions on political, racial or religious grounds in execution of or in connection with any crime within the jurisdiction of the Tribunal . . . .

*Id.* at XII; *see also Matter of McMullen*, 19 I&N Dec. at 96 (referring to the definition of "crimes against humanity" in Article 6 of the London Charter in determining that the respondent engaged in persecution).

In trying persons for war crimes and crimes against humanity, the International Military Tribunal recognized that persons could not be held individually responsible for executing an order unless they had the ability to make a moral choice.  *See I Trial of the Major War Criminals before the International Military Tribunal* 224 (Nuremberg 1947), https://www.loc.gov/rr/frd/Military_Law/pdf/NT_Vol-I.pdf ("The true test, which is found in

varying degrees in the criminal law of most nations, is not the existence of the order, but whether moral choice was in fact possible."). This "test" is known as the "Nuremberg Principle IV," which states: "The fact that a person acted pursuant to order of his Government or of a superior does not relieve him from responsibility under international law, provided a moral choice was in fact possible to him." *Principles of International Law Recognized in the Charter of the Nürnberg Tribunal and in the Judgment of the Tribunal*, http://legal.un.org/ilc/texts/instruments/english/draft_articles/ 7_1_1950.pdf (1950 Report of the International Law Commission to the General Assembly).

The Law No. 10 established a "uniform legal basis in Germany for the prosecution of war criminals . . . , other than those dealt with by the International Military Tribunal." *I Trials of War Criminals*, *supra*, at XVI. The definition of "crimes against humanity" in Law No. 10 is similar to that in the London Charter:

> Atrocities and offences, including but not limited to murder, extermination, enslavement, deportation, imprisonment, torture, rape, or other inhumane acts committed against any civilian population, or persecutions on political, racial or religious grounds whether or not in violation of the domestic laws of the country where perpetrated.

*Id.* at XVII. The parties and amici point to several decisions by the Nuremberg Military Tribunals under Law No. 10 that consider the duress defense to war crimes and crimes against humanity. Although there was no uniform definition of duress, these decisions describe the characteristics of a duress defense. For example, in "The Einsatzgruppen Case," the Tribunal held that superior orders is a defense to criminal liability for crimes against humanity and war crimes only when duress is involved, stating:

> But it is stated that in military law even if the subordinate realizes that the act he is called upon to perform is a crime, he may not refuse its execution without incurring serious consequences, and that this, therefore, constitutes duress. Let it be said at once that there is no law which requires that an innocent man must forfeit his life or suffer serious harm in order to avoid committing a crime which he condemns. The threat, however, must be imminent, real, and inevitable. No court will punish a man who, with a loaded pistol at his head, is compelled to pull a lethal lever.

*IV Trials of War Criminals*, *supra*, at 480.

Thus, Article 1F(a)'s reference to these definitions of "war crimes" and "crimes against humanity" indicates that the drafters of the Convention chose the term "crime" and intended, at least implicitly, that international criminal law concepts such as duress should be included. This makes the rulings of

the military tribunals relevant since they interpreted and applied those terms. The Tribunals determined that persons could not be guilty of these crimes if they acted under duress, that is, without freedom of choice. It is thus clear both that Article 1F(a) was informed by these war crime tribunal precedents and that the principle of duress was carried over into its enactment.

This conclusion is also consistent with guidance of the United Nations High Commissioner for Refugees ("UNHCR") regarding the Convention. Given that the Convention was drafted in the years immediately following the Holocaust and World War II, there was "an agreement on the part of the States that war criminals should not be protected" by the Convention. Office of the High Commissioner for Refugees, *Handbook and Guidelines on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees* para. 148 (Geneva, January 1992) ("*Handbook*"). At the same time, the Exclusion Clauses were to be restrictively applied given the "serious consequences of exclusion." *Id.* para. 149.[12] More recently, the UNHCR issued further guidance on the application of the Exclusion Clauses in its *Background Note*, which specifically provides for a duress defense to war crimes and crimes against humanity. *See* UNHCR, *Background Note on the Application of the Exclusion Clauses: Article 1F of the 1951 Convention relating to the Status of Refugees*, paras. 69, 70, annex C (Sept. 4, 2003) ("*Background Note*").[13]

The decisions of other State Parties to the Convention, including Australia, Canada, New Zealand, and the United Kingdom, likewise support this conclusion. Those State Parties interpret Article 1F(a) as excluding from refugee protection only those persons who are culpable for their crimes. For example, the Federal Court of Australia has held that a person cannot be held to have committed a crime under Article 1F(a) if he has a defense that would clear him from criminal liability. *See SRYYY v Minister for Immigration & Multicultural & Indigenous Affairs* (2005) 147 F.C.R. 1, para. 127 (Austl.). Similarly, the Supreme Court of the United Kingdom, in highlighting the serious consequences of excluding a person who has a well-founded fear of persecution from the protection of the Convention, has held that Article 1F should be interpreted restrictively and applied with caution, such that "there should be serious reasons for considering that the person concerned bore

---

[12] We agree with the DHS that we are not bound by the *Handbook*, but it provides useful guidance for interpreting the Protocol. *See Cardoza-Fonseca*, 480 U.S. at 439 n.22. Further, due to the nature of the question before us, the *Handbook* may be of particular use in determining the intent behind certain provisions.

[13] The dissent dismisses this UNHCR guidance in large part as being remote in time from adoption of the Convention and Protocol. However, it is clear that the *Background Note* was not proposing a new interpretation but rather reflected an established interpretation consistent with the overall purposes of the Convention and the antecedent legal authorities discussed above.

individual responsibility for acts of that character." *Al-Sirri v. Sec'y of State for the Home Dep't* [2012] UKSC 54 [16] (appeal taken from EWCA (Civ) 222).

Although the dissent disputes our conclusion that the Convention and Protocol implicitly acknowledge a defense of duress, it cannot refute that such a defense was recognized, at least in principle, by tribunals interpreting the antecedents to Article 1(F) of the Convention. Furthermore, while authorities such as the UNHCR *Handbook* and jurisprudence from other jurisdictions are not binding, they take on added authority in light of Congress' specific direction, in the Conference Report on the Refugee Act, that the persecutor bar "be construed consistent with the Protocol." H.R. Rep. No. 96-781, at 20.

The dissent's claim that the Convention and Protocol do not provide for a defense of duress is disproved by the fact that these authorities uniformly recognize such a defense, and the dissent cites to no authority interpreting the Convention or Protocol that holds otherwise. The dissent's argument that duress is a question justiciable in criminal law, but not in civil immigration proceedings, fails because the language of criminal culpability was carried over into Article 1(F) and is widely recognized as equally justiciable as the myriad other factors that are to be determined in refugee adjudications.[14]

In sum, given the legislative history of the Refugee Act, our interpretation of the persecutor bar is consistent with the Exclusion Clauses, which require consideration of the actual culpability of an applicant who might be subject to those clauses. A limited defense of "duress" is consistent with this interpretation, whereas the exclusion of such a defense arguably departs from the overall congressional intent that we should interpret the Refugee Act consistent with the Convention.

## C. Adverse Consequences

Adverse consequences follow from the dissent's interpretation, which advocates for precluding a duress defense. For example, the dissent's approach effectively finds that an alien who is otherwise fully eligible for asylum or withholding of removal would be barred from relief for conduct that he or she finds completely abhorrent but that was undertaken wholly under severe duress, such as imminent threat of loss of life or subjection to torture. The dissent concludes that congressional silence is sufficient to

---

[14] The dissent's claim that no duress exception should be recognized because Congress has provided for analogous exceptions in other provisions of the Act is not persuasive because none of the cited provisions involved implementation of a treaty obligation. For the same reason, the dissent's reliance on *Matter of M-H-Z-*, 26 I&N Dec. 757 (BIA 2016), is misplaced.

support this result. However, it can be contended with equal force that congressional silence should not be interpreted to reach such an extreme result.

The DHS argues that the administrative burden resulting from allowing the agency to adjudicate a duress defense is so significant that it is best not to recognize one. But administrative convenience cannot settle the matter. Asylum adjudication is full of challenging determinations, including, most prominently and frequently, credibility. While asylum claims form a very large portion of the Immigration Court dockets nationwide, the same cannot be said of asylum cases involving the persecutor bar, which are a small fraction of the asylum caseload. The challenges inherent in adjudicating these claims is no reason to shut off a life line in a compelling case in the refugee context.

A straightforward example illustrates the dilemma that will be raised by creating the bright line rule advanced by the DHS that admits of no exceptions. While not dispositive as a tool of statutory construction, the child soldier scenario warrants consideration and is relevant to the asylum context. Children are recruited worldwide by persecutors to engage in persecutory acts. They do not have the option to resist. Congress enacted the Child Soldiers Accountability Act of 2008, Pub. L. No. 110-340, 122 Stat. 3735, making the recruitment of child soldiers abroad a violation of domestic law under 18 U.S.C. § 2442 (Supp. II 2008), as well as grounds of inadmissibility and deportability under sections 212(a)(3)(G) and 237(a)(4)(F) of the Act, 8 U.S.C. §§ 1182(a)(3)(G) and 1227(a)(4)(F) (Supp. II 2008).

The legislative history of the Child Soldiers Accountability Act makes clear that child soldiers, who themselves have engaged in persecutory conduct, are considered victims of adult war criminals. According to the legislative history, former child soldiers should not be subjected to legal disability. *See* 154 Cong. Rec. 18,790, 18,792 (2008); 154 Cong. Rec. 18,018 (2008); 153 Cong. Rec. 36,173, 36,174 (2007). Moreover, case law has recognized former child soldiers who escaped captivity as a cognizable particular social group for purposes of asylum. *See, e.g.*, *Lukwago v. Ashcroft*, 329 F.3d 157, 183 (3d Cir. 2003) (remanding to consider whether the applicant had demonstrated a well-founded fear of persecution on account of his membership in a particular social group of former child soldiers who have escaped captivity). It does not make sense to automatically bar a former child soldier who qualifies as a member of a particular social group with a well-founded fear of persecution from receiving asylum based on participation in persecutory acts under duress. Yet no other outcome would be available under the "bright line" persecutor bar that does not permit any exception proposed by the DHS and the dissent.

## IV. LIMITED NATURE OF THE DEFENSE

Given the humanitarian purposes of the Refugee Act and the clear intent of Congress that it be interpreted in accord with the scope of protection offered by the Convention and Protocol, we adopt a limited and strictly construed duress defense to the persecutor bar.

In the United States, the defense of duress has roots in statutory and common law, as reflected in the Model Penal Code[15] and decisions of the United States Supreme Court. *See Dixon v. United States*, 548 U.S. 1, 6–7, 8–9 (2006) (holding that the duress defense is a common-law rule that excuses otherwise punishable conduct but does not obviate the elements of the offense, and which places the burden of proof on the defendant); *United States v. Bailey*, 444 U.S. 394, 409–10 (1980). The duress defense also has roots in international law, as reflected in the Rome Statute of the International Criminal Court (2002), https://www.icc-cpi.int/nr /rdonlyres/ea9aeff7-5752-4f84-be94-0a655eb30e16/0/rome_statute_english .pdf ("Rome Statute"), which is used by other State Parties to the Convention.[16] Moreover, the *Background Note* cites the Rome Statute in

---

[15] Regarding the defense of duress, section 2.09 of the Model Penal Code provides, in pertinent part:

> (1) It is an affirmative defense that the actor engaged in the conduct charged to constitute an offense because he was coerced to do so by the use of, or a threat to use, unlawful force against his person or the person of another, that a person of reasonable firmness in his situation would have been unable to resist.
> (2) The defense . . . is unavailable if the actor recklessly placed himself in a situation in which it was probable that he would be subjected to duress.

[16] Article 31(1) of the Rome Statute provides in pertinent part:

> [A] person shall not be criminally responsible if, at the time of that person's conduct:
>
> . . .
>
> (d) The conduct which is alleged to constitute a crime within the jurisdiction of this Court has been caused by duress resulting from a threat of imminent death or of continuing or imminent serious bodily harm against that person or another person, and the person acts necessarily and reasonably to avoid this threat, provided that the person does not intend to cause a greater harm than the one sought to be avoided.

Rome Statute, *supra*, at 20; *see also Zimbabwe v. Sec'y of State for the Home Dep't* [2012] UKUT 00015 (IAC) [106]; *Diaz v. Canada* (Minister of Citizenship and Immigr.) [2013] F.C.J. No. 66 [51] (Can.).

concluding that "[t]here are, therefore, stringent conditions to be met for the defence of duress to arise," and decisions from other jurisdictions reflect this stringency. *Background Note*, *supra*, at para. 69; *Canada (Minister of Citizenship and Immigration) v. Maan* [2007] FC 583 [16]–[21] (Can.); *VWYJ v Minister for Immigration & Multicultural & Indigenous Affairs* (2005) FCA 658, 9 (Austl.); Refugee Appeal No. 61/91 [1992] NZRSAA (N.Z.).

The minimum threshold requirements of the duress defense to the persecutor bar are based on the formulations found in United States criminal law and international law. While we need not define the precise boundaries of a duress standard in the context of this case, at a minimum the applicant must establish by a preponderance of the evidence that he (1) acted under an imminent threat of death or serious bodily injury to himself or others; (2) reasonably believed that the threatened harm would be carried out unless he acted or refrained from acting; (3) had no reasonable opportunity to escape or otherwise frustrate the threat; (4) did not place himself in a situation in which he knew or reasonably should have known that he would likely be forced to act or refrain from acting; and (5) knew or reasonably should have known that the harm he inflicted was not greater than the threatened harm to himself or others. Only if the applicant establishes each element by a preponderance of the evidence would it be appropriate to consider whether the duress defense applies.

This duress standard is intended to apply only in rare and extraordinary circumstances consistent with United States law.[17] First, the threat must be present and immediate, and it must involve a threat of death or serious bodily injury to the applicant or others.[18] According to United States law,

[T]he term "serious bodily injury" means bodily injury which involves—

---

[17] In *Dixon*, 548 U.S. at 4 n.2, the Court accepted the following description of the elements of the duress defense:

(1) the defendant was under an unlawful and imminent threat of such a nature as to induce a well-grounded apprehension of death or serious bodily injury; (2) the defendant had not recklessly or negligently placed herself in a situation in which it was probable that she would be forced to perform the criminal conduct; (3) the defendant had no reasonable, legal alternative to violating the law, that is, a chance both to refuse to perform the criminal act and also to avoid the threatened harm; and, (4) that a direct causal relationship may be reasonably anticipated between the criminal act and the avoidance of the threatened harm.

[18] The follwing circuit courts allow for the threat to be directed at any third person. *See* 6th Cir. Pattern Crim. Jury Instr. 6.05 (2017); 3d Cir. Model Crim. Jury Instr. 8.03 (2015); 8th Cir. Model Crim. Jury Instr. 9.02 (2014); 7th Cir. Pattern Crim. Jury Instr. 6.08 (2012); 10th Cir. Crim. Pattern Jury Instr. 1.36 (2011); 11th Cir. Pattern Crim. Jury Instr. 16 (2010).

     (A) a substantial risk of death;
     (B) extreme physical pain;
     (C) protracted and obvious disfigurement; or
     (D) protracted loss or impairment of the function of a bodily member, organ, or mental faculty . . . .

18 U.S.C. § 1365(h)(3) (2012); *see also, e.g.*, 18 U.S.C. § 2119 (2012) (cross-referencing § 1365 for the definition of serious bodily injury); *United States v. Morrison*, 332 F.3d 530, 533 (8th Cir. 2003) (holding that injuries sustained from two blows to the head with a baseball bat constitute serious bodily injury); *United States v. Two Eagle*, 318 F.3d 785, 792 (8th Cir. 2003) (holding that gunshot wounds to the leg constitute serious bodily injury).[19]

    Moreover, this standard incorporates a "proportionality" element requiring the applicant to show that the threatened harm to himself or others was greater than or equal to the harm he was forced to inflict. This element derives from international law, which prescribes that the "harm inflicted on the victim . . . must not be in excess of that which would otherwise have been directed at the applicant." *Kathiravel v. Canada* (Minister of Citizenship and Immigration), 2003 F.C.T. 680, para. 48 (Can.) (concluding that threats of beatings and food deprivation against the applicant, who was forced to work as an informant in a Sri Lankan prison camp, were not greater than the torture suffered by those he identified as Tamil Tigers); *see also Ramirez v. Canada* (Minister of Employment and Immigration), 1992 F.C.L. 109, para. 39 (Can.) (concluding that the hard training exercises and 10 years of imprisonment used to punish the applicant's dissent from or nonparticipation in the Salvadoran military's torture and killing of prisoners was "clearly less than the harm actually inflicted on the victims").[20]

---

[19] The United States Supreme Court and every circuit court have endorsed the view that an imminent threat of "death or serious bodily injury" is an element of the duress defense. *Dixon*, 548 U.S. at 4 n.2; *United States v. Ricks*, 573 F.3d 198, 202 (4th Cir. 2009); *United States v. Sawyer*, 558 F.3d 705, 710–11 (7th Cir. 2009); *United States v. Deleveaux*, 205 F.3d 1292, 1296 n.3 (11th Cir. 2000); *United States v. Posada-Rios*, 158 F.3d 832, 873 (5th Cir. 1998); *United States v. Newcomb*, 6 F.3d 1129, 1134–35 (6th Cir. 1993); *United States v. Amparo*, 961 F.2d 288, 291 (1st Cir. 1992); *United States v. Santos*, 932 F.2d 244, 249 (3d Cir. 1991); *United States v. Bakhtiari*, 913 F.2d 1053, 1057 (2d Cir. 1990); *United States v. Scott*, 901 F.2d 871, 873 (10th Cir. 1990); *United States v. Wells*, 773 F.2d 230, 231 (8th Cir. 1985) (per curiam); *United States v. Jenrette*, 744 F.2d 817, 820–21 (D.C. Cir. 1984); *United States v. Contento-Pachon*, 723 F.2d 691, 693 (9th Cir. 1984).

[20] In United States criminal law, the concept of proportionality is historically associated with the necessity defense. *See* Model Penal Code § 3.02(1)(a) (2018) ("Conduct that the actor believes to be necessary to avoid a harm or evil to himself or to another is justifiable, provided that:  (a) the harm or evil sought to be avoided by such conduct is greater than that sought to be prevented by the law defining the offense charged . . . .").

Thus, this "proportionality" element narrows the scope of the duress defense for applicants who have assisted or otherwise engaged in persecution. The harm these applicants inflict on their victims will always rise to the level of persecution. Therefore, as a practical matter, the proportionality element means that the threatened harm against an applicant must at least rise to the same level. Otherwise, the duress defense cannot apply.

Second, this is an objective standard requiring the applicant to demonstrate that a reasonable person in similar circumstances would have acted in a similar way. *See, e.g.*, *Matter of Mogharrabi*, 19 I&N Dec. 439, 445 (BIA 1987) (stating that an asylum applicant establishes a well-founded fear "if he shows that a reasonable person in his circumstances would fear persecution"). According to the explanatory note to section 2.09 of the Model Penal Code, "The standard is thus partially objective; the defense is not established simply by the fact that the defendant was coerced; he must have been coerced in circumstances under which a person of reasonable firmness in his situation would likewise have been unable to resist."

Third, the standard we adopt requires the applicant to show that he did not have a reasonable opportunity to escape or to otherwise avoid engaging in the act or omission. And he must show that he did not place himself in a situation in which he knew or reasonably should have known that he would likely be forced to act or refrain from acting. These requirements taken together underscore that the duress defense is intended for rare cases where the alien was not culpable for contributing to the persecution.

Finally, even if an applicant is able to meet these standards, a grant of relief is by no means ensured. For example, although the applicant in this case was granted deferral of removal under the Convention Against Torture, there is no assurance that other applicants would meet the high standard for this form of protection. The same holds true for applicants for withholding of removal, who must establish a probability that their life or freedom would be threatened on account of a protected ground. An applicant for asylum must demonstrate that he warrants this relief in the exercise of discretion, and nothing in this opinion should be construed as foreclosing an adverse discretionary finding in the case of an alien who has participated in persecution, even if against his will. Thus, the concerns raised by the late Justice Scalia in his concurring opinion in *Negusie* regarding the merits of granting asylum to some applicants should not lead us to deny the defense of duress to all applicants, but they may be relevant in particular cases. *Negusie*, 555 U.S. at 527 (Scalia, J., concurring) (suggesting that it might "be imprudent to grant entry to a coerced persecutor, who may end up living in the same community as one of his victims").

## V. FRAMEWORK FOR ANALYZING A CLAIM OF DURESS

The Court in *Negusie* noted that, on remand, "'persecution' may be explained by a more comprehensive definition, one designed to elaborate on the term in anticipation of a wide range of potential conduct; and that expanded definition in turn may be influenced by how practical, or impractical, the standard would be in terms of its application to specific cases." *Negusie*, 555 U.S. at 524. Thus, it is incumbent on us to consider not only whether the Refugee Act permits the establishment of a duress defense to the persecutor bar, but also whether such a defense can be successfully adjudicated in practice.

As an initial point, we interpret the term "persecution" in the persecutor bar as carrying the same meaning as it does in the context of determining an alien's eligibility for asylum or withholding of removal. Duress is not relevant to establishing whether one has been subject to or reasonably fears "persecution." An alien applying for asylum need not establish that those who persecuted him acted without duress. Nor is duress relevant to determining whether one has "ordered, incited, assisted, or otherwise participated in" persecution. In other words, the DHS may satisfy its burden to show that the persecutor bar may apply even though the alien acted under duress.[21] The question of duress is distinct: whether protection otherwise afforded under the law should be foreclosed based on conduct that is claimed not to be culpable because of such duress.

Issues arising under the persecutor bar will be justiciable as a practical matter. The adjudicator should first determine whether the applicant is otherwise eligible for asylum or withholding of removal. Our established Board precedent provides a framework for analyzing a claim of duress against the application of the persecutor bar. Claims of duress, if accepted, will be considered within the regulatory structure at 8 C.F.R. § 1240.8(d) (2018). Pursuant to that regulation, the initial burden is on the DHS to show evidence that indicates that the alien assisted or otherwise participated in persecution. *See Matter of A-H-*, 23 I&N Dec. 774, 786 (A.G. 2005) (acknowledging that the Government must "offer sufficient prima facie evidence" that the alien "incited, assisted, or otherwise participated in persecution"). Once the DHS meets its burden, the burden shifts to the alien to show by a preponderance of the evidence that the persecutor bar does not apply either because he did not engage in persecution or because he acted under duress. *See Matter of M-B-C-*, 27 I&N Dec. 31, 36 (BIA 2017)

---

[21] We disagree with the applicant's contention that acts that would otherwise qualify as "persecution" are not "persecution" if taken under duress. This is not how the defense of duress has been applied in our sister jurisdictions and, as previously explained, it is inconsistent with how the defense of duress has been interpreted in American courts.

(holding that "the relevant inquiry under 8 C.F.R. § 1240.8(d) is whether *the evidence indicates* that the grounds for mandatory denial . . . *may apply* to [the applicant] so that he then has the burden to show that they do not apply").

Regarding the DHS's initial burden of proof to show that the alien assisted or otherwise participated in persecution, we find it appropriate to apply the standard we recently adopted in *Matter of D-R-*, 27 I&N Dec. 105 (BIA 2017). In that case, we concluded that the phrase "assisted or otherwise participated in" extrajudicial killing under section 212(a)(3)(E)(iii) of the Act is ambiguous. *Id.* at 118. We constructed a standard to determine whether an alien's conduct amounted to assistance or participation in extrajudicial killing, stating that an adjudicator should consider "(1) the nexus between the alien's role, acts, or inaction, and the extrajudicial killing; and (2) his scienter, meaning his prior or contemporaneous knowledge of the killing." *Id.* at 120. We specifically noted that this interpretation of the term "assisted, or otherwise participated in" can be applied in the context of the persecutor bar. *Id.* at 119 n.17. Additionally, when determining whether an alien assisted or participated in the persecution of others, the proper focus is not on the alien's motives, but "rather on the intent of the perpetrator of the underlying persecution." *Matter of J.M. Alvarado*, 27 I&N Dec. at 29.

Thus, to determine whether the DHS satisfied its initial burden of proving that the alien assisted or otherwise participated in persecution, the adjudicator should consider (1) the "nexus between the alien's role, acts, or inaction" and the persecution; and (2) the alien's "scienter, meaning his prior or contemporaneous knowledge" of the persecution. *Matter of D-R-*, 27 I&N Dec. at 120. While distinct from the question of duress, the issues raised in these cases involve similar complexities of fact-finding against a common legal standard as that which would arise in addressing a claim of duress. Recognition of such a defense, therefore, would not constitute a departure from the types of questions commonly addressed by the Board and Immigration Courts. Nor would it impose burdens of fact-finding that are not already encountered in addressing such questions.

Once the DHS has met its initial burden, the burden shifts to the alien to show by a preponderance of the evidence that the persecutor bar does not apply, either because he did not engage in persecution or because he acted under duress. An applicant must satisfy each element of the 5-part duress standard by a preponderance of the evidence. Only then will the adjudicator consider whether a duress defense to the persecutor bar is warranted.

## VI. APPLICANT'S DURESS CLAIM

It is undisputed that the DHS met its initial burden of proving that the applicant assisted or otherwise participated in persecution. The applicant did

not challenge the Immigration Judge's finding that he had knowledge of the persecution and that the nexus requirement was met. Therefore, under the standard we have articulated, the burden shifts to the applicant to show that the persecutor bar did not apply or that he was not subject to the bar because he acted under duress. Applying the regulatory framework to this case, we conclude that when viewing the facts and circumstances in the light most favorable to the applicant, he cannot meet this burden.

The applicant testified that he was conscripted into the Eritrean military and, when he refused orders, was punished severely and transferred to serve as an armed prison guard. Neither his forced conscription nor his assignment to guard duty meet the high standard for a duress defense.

Even if an alien claims a "superior orders" defense, he must show duress. *See Background Note*, *supra*, paras. 67–69. The applicant testified that when he disobeyed orders to render assistance to prisoners, he received verbal reprimands from his superiors. Thus, the threats of death he received should he disobey orders, when viewed in context, did not constitute the imminent threat of death or serious bodily injury required to meet the standard of duress.

Furthermore, the record indicates that the applicant had a reasonable opportunity to escape or otherwise avoid guarding the prisoners who were subjected to harm and torture. The applicant testified that he could not leave the military base, but he eventually escaped through a "weak spot" and walked through the jungle to his friend's home. We therefore find that a remand for further proceedings is not warranted. Accordingly, the applicant's appeal will be dismissed.

**ORDER:** The applicant's appeal is dismissed.

**FURTHER ORDER:** Pursuant to 8 C.F.R. § 1003.1(d)(6) (2018), the record is remanded to the Immigration Judge for the purpose of allowing the Department of Homeland Security the opportunity to complete or update identity, law enforcement, or security investigations or examinations, and further proceedings, if necessary, and for the entry of an order as provided by 8 C.F.R. § 1003.47(h) (2018).


*CONCURRING AND DISSENTING OPINION*: Garry D. Malphrus, Board Member

I concur with the majority's decision only to the extent that it dismisses the applicant's appeal. However, I respectfully dissent from the majority's creation of a duress exception to the persecutor bar.

The United States Supreme Court remanded this case for us to make an "initial determination of the statutory interpretation question," *Negusie v. Holder*, 555 U.S. 511, 524 (2009), "with respect to whether an alien who

was coerced to assist in persecution is barred from obtaining asylum in the United States," *id.* at 525 (Scalia, J., concurring). The remand directed us to interpret the statute anew based on principles of statutory construction, free of our prior assumption that *Fedorenko v. United States*, 449 U.S. 490 (1981), definitively resolved this question. The majority decision is artfully drafted, but it does not engage in this analysis. Instead, the majority reads a duress exception into the 1967 United Nations Protocol Relating to the Status of Refugees, *opened for signature* Jan. 31, 1967, 19 U.S.T. 6223, 606 U.N.T.S. 267 (entered into force Oct. 4, 1967; for the United States Nov. 1, 1968) ("Protocol"), and, by extension, the Refugee Act of 1980, Pub. L. No. 96-212, 94 Stat. 102 ("Refugee Act"), that simply does not exist. And it does so essentially by deferring to international expectations of how the Protocol should be interpreted. I cannot agree with this approach.

A faithful application of the principles of statutory construction in this case clearly leads to the result that Congress—and the drafters of the treaty at issue here—did not create a duress exception to the persecutor bar. The Board has never found a duress exception in the nearly four decades since the Refugee Act was enacted, and Congress has not amended the applicable language to add one during that time. The Board exceeds its authority by reading an intent into the law that was never there. I recognize that the lure for us to create a duress exception is strong, but the greater strength is in recognizing the limits of our role within the legal system and in deferring to Congress on how to best address this most fundamental issue of asylum law.

## I. ANALYSIS

The "persecutor bar" precludes from eligibility for asylum or withholding of removal "any person who ordered, incited, assisted, or otherwise participated in the persecution of any person on account of race, religion, nationality, membership in a particular social group, or political opinion." Section 101(a)(42) of the Immigration and Nationality Act, 8 U.S.C. § 1101(a)(42) (2012) (added by section 201(a) of the Refugee Act, 94 Stat. at 102–03). The issue before us is whether there is an implicit duress exception to the persecutor bar. To answer this question, we "first review the text and structure of the statute . . . and then consider the text and negotiating history of the Convention." *Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155, 171 (1993); *see also INS v. Stevic*, 467 U.S. 407, 428 n.22 (1984) (stating that the Protocol is a non-self-executing treaty, which does not confer any rights upon aliens beyond those granted by the implementing domestic legislation). Neither the text of the Refugee Act and the Protocol nor the relevant history of these documents indicates an intent to include a duress exception to the persecutor bar in the Act.

### A. Statutory Interpretation

The applicant initially argues that the term "persecution" in the Act inherently requires voluntariness and excludes duress. However, the majority properly rejects this argument, which the Board has never adopted. The Supreme Court has held that while duress is a defense to liability in the criminal context, it does not negate the fact that the offender acted knowingly or voluntarily. *Dixon v. United States*, 548 U.S. 1, 6–7 (2006); *United States v. Bailey*, 444 U.S. 394, 409–10 (1980). Thus, the Court has rejected the fundamental premise of the applicant's claim that duress goes to whether the offender's conduct was voluntary. The term "persecution" does not differentiate based on the actor's intent or motivation. *See Matter of J.M. Alvarado*, 27 I&N Dec. 27, 29–30 (BIA 2017) (holding that the persecutor bar applies to an alien who assists or otherwise participates in the persecution of another person without regard to the alien's personal motivation for his or her actions).

The majority is correct that the legislative history of the Refugee Act makes clear that it was designed to bring the domestic laws of the United States into conformity with its treaty obligations under the Protocol, which incorporated the 1951 United Nations Convention Relating to the Status of Refugees, *adopted* July 28, 1951, 19 U.S.T. 6259, 189 U.N.T.S. 150 (entered into force Apr. 22, 1954) ("Convention"). *See, e.g.*, *Matter of J.M. Alvarado*, 27 I&N Dec. at 30 n.3; *see also Stevic*, 467 U.S. at 421 ("Section 203(e) of the Refugee Act of 1980 amended the language of [the withholding of deportation provision], basically conforming it to the language of Article 33 of the United Nations Protocol.").

The majority also accurately notes that the legislative history explains that the persecutor bar should be construed consistent with the Protocol and the Convention. H.R. Rep. No. 96–608, at 10, 19–20 (1979); *see also* H.R. Rep. No. 96–781, at 20 (1980) (Conf. Rep.); S. Rep. No. 96-256, at 4, 9, 14–15, 18 (1979). However, beyond referring to the Convention and the Protocol, the legislative history does not answer the question presented in this case, namely, whether Congress intended duress to be an exception to the persecutor bar.

Next, in looking to the language and drafting history of the Convention, and by extension the Protocol, we still do not find an answer. The Convention places an obligation on signatory States not to "expel or return ('refouler') a refugee in any manner whatsoever to . . . territories where his life or freedom would be threatened on account of his race, religion, nationality, membership of a particular social group or political opinion." Convention, Art. 33(1). However, Article 1F of the Convention contains a

mandatory exclusion provision that prohibits the granting of refugee status to

> *any person* with respect to whom there are serious reasons for considering that:
>     (a) he has committed a crime against peace, a war crime, or a crime against humanity, as defined in the international instruments drawn up to make provision in respect of such crimes;
>     (b) he has committed a serious non-political crime outside the country of refuge prior to his admission to that country as a refugee;
>     (c) he has been guilty of acts contrary to the purposes and principles of the United Nations.

(Emphasis added.)

The text of Article 1F of the Convention does not provide a duress exception for the prohibited acts. *See Sumitomo Shoji Am., Inc. v. Avagliano*, 457 U.S. 176, 180 (1982) ("Interpretation of [a treaty] must, of course, begin with the language of the [t]reaty itself."). Instead, it references types of crimes that bar "any person" from refugee protection. The language it uses is significantly different from the more precise wording of the persecutor bar in the Act. But like the persecutor bar, it makes no reference to different treatment for persons who are found to have engaged in the specified conduct while under duress. Even if Congress had adopted the language of Article 1F verbatim, it simply does not contain a duress exception.

Like the legislative history of the persecutor bar in the Act, the drafting and negotiating history of the Convention is also silent as to whether there is a duress exception in Article 1F, and it does not otherwise address this issue. *Air France v. Saks*, 470 U.S. 392, 400 (1985) ("In interpreting a treaty it is proper, of course, to refer to the records of its drafting and negotiation." (citation omitted)). The negotiating history of the Convention clearly shows an intent to ensure that war criminals were not afforded refugee protection. *See Conference of Plenipotentiaries on the Status of Refugees and Stateless Persons: Summary Record of the Twenty-fourth Meeting* (Nov. 27, 1951), Conference of the Draft Convention on the Status of Refugees, http://www.unhcr.org/protect/PROTECTION/3ae68cde18.html (statements of Mr. Von Trützschler, Federal Republic of Germany, and Mr. Robinson, Israel) [hereinafter *Conference of Plenipotentiaries*]. However, there is no indication that the Convention's drafters intended to provide a duress exception to Article 1F, particularly given the dearth of discussion between the negotiators on this controversial and complex issue. *See Negusie*, 555 U.S. at 526 (Scalia, J., concurring) ("The culpability of one who harms another under coercion is, and has always been, a subject of intense debate, raising profound questions of moral philosophy and individual responsibility."). As the Israeli representative recognized, the "Conference

was restricted to establishing a legal status for refugees. It was not called upon to legislate in questions of international criminal law, or to define international crimes and embody them in provisions which would exclude certain categories of persons from the scope of the Convention." *Conference of Plenipotentiaries*, *supra* (statement of Mr. Robinson).

The majority claims that since the text of Article 1F of the Convention refers to crimes, the drafters must have intended a criminal duress exception to exist. However, this argument assumes far too much. The fact that duress may sometimes be available as a defense to negate culpability in the criminal context does not mean that a duress exception is implicit in the Act's persecutor bar.

As an initial matter, it is important to recognize that immigration proceedings are civil, not criminal, in nature. *See INS v. Lopez-Mendoza*, 468 U.S. 1032, 1038–39 (1984). Such a distinction is particularly significant in the refugee context, where, as in this case, the alien is seeking an immigration benefit. The persecutor bar does not provide for criminal punishment for persecution—rather, it is a bar to immigration benefits for an individual who was involved in persecution. *See, e.g.*, *Schellong v. INS*, 805 F.2d 655, 662 (7th Cir. 1986) (stating that the purpose of a bar to relief from deportation for individuals who participated in Nazi crimes against humanity was "not to punish [these] individuals for actions previously taken, but to ensure that the United States is not a haven for individuals who assisted the Nazis in the brutal persecution and murder of millions of people"). Such a distinction is significant in the context of the persecutor bar and the overall structure of the Act, which indicates that Congress has prioritized protecting those who have been victims of persecution.[1]

Moreover, duress is not always a defense in criminal law. For example, at common law, duress was not a defense to intentional killing. *See Arp v. State*, 12 So. 301, 302 (Ala. 1893); *Commonwealth v. Vasquez*, 971 N.E.2d 783, 790–92 (Mass. 2012); *see also* 2 Wayne R. LaFave, *Substantive Criminal Law* § 9.7(b) (3d ed.), Westlaw (database updated Oct. 2017). Further, even today, nearly half of the States in the United States do not permit the duress defense if the defendant has been charged with murder. *See, e.g.*, LaFave, *supra*, § 9.7(b) & nn.53–54.

---

[1]   Further, it is noteworthy that the mandatory exclusion provision at Article 1F of the Convention does not condition exclusion on an actual finding of criminal responsibility. Rather, it provides for exclusion if there are "serious reasons for considering" that the person has committed one of the crimes in question. While there may be circumstances in which a person would be excused from criminal responsibility by a duress defense in an actual prosecution, the possibility that such a defense might be raised does not mean that there are not at least "serious reasons for considering" that the individual committed the crime. Nor does it mean that the person did not actually commit an action that constitutes persecution.

The majority relies heavily on the reference in Article 1F to "international instruments" to find a duress exception, citing the London Agreement of 8 August 1945 and Charter of the International Military Tribunal ("London Charter") and Control Council Law No. 10 ("Law No. 10"), *in I Trials of War Criminals Before the Nuernberg Military Tribunals Under Control Council Law No. 10*, at IX–XI, XVI–XVII (Oct. 1946–Apr. 1949), http://www.loc.gov/rr/frd/Military_Law/NTs_war-criminals.html [hereinafter *Trials of War Criminals*]. However, the language of the London Charter and Law No. 10 does not contain a duress exception but, instead, indicates that the fact that someone acted pursuant to the orders of superior military officers potentially "may be considered in mitigation" of punishment. *I Trials of War Criminals*, *supra*, at XII, XVII.

Unlike military tribunals or criminal courts, Immigration Courts are not called upon to assess an alien's criminal guilt or innocence. Nor can an Immigration Court consider factors in mitigation of punishment. "[T]hese are civil immigration proceedings whose purpose is to determine [an alien's] eligibility to remain in this country, not to punish him for criminal or other conduct in his home country." *Matter of D-R-*, 25 I&N Dec. 445, 462 (BIA 2011) (citation omitted), *remanded on other grounds*, *Radojkovic v. Holder*, 599 F. App'x 646 (9th Cir. 2015). While duress may mitigate a criminal defendant's moral blameworthiness in military tribunals or criminal courts, the statutory scheme designed by Congress does not provide for mitigation of punishment, as in the criminal context. Rather, it only permits us to determine whether the persecutor bar applies and, thus, whether an alien may or may not be eligible for the benefit of asylum and withholding of removal.

In addition to its overreliance on Article 1F of the Convention, the majority emphasizes that, in the face of congressional silence, the Supreme Court's remand of this case gives the Board the authority to create a duress exception. While the Supreme Court found that Congress' silence was not dispositive, its silence should cause us to exercise great caution as we apply our judgment and expertise to this complex issue and consider the ramifications of creating a duress exception for the first time.

## B. International Interpretation

The Office of the United Nations High Commissioner for Refugees ("UNHCR") has generally addressed the issue of duress through interpretative guidance based on the practices of some of the member States. However, this guidance was issued in 2003, more than two decades after the United States assented to the treaty in 1980, and it did not include how this issue had been interpreted in the United States. The UNHCR Guidelines encourage contracting States to consider "[f]actors generally considered to

constitute defenses to criminal responsibility," such as "duress." UNHCR, *Guidelines on International Protection: Application of the Exclusion Clauses: Article 1F of the 1951 Convention Relating to the Status of Refugees*, para. 22 (Sept. 4, 2003) ("*Guidelines*"). Previously, the UNHCR's *Handbook*, which was first issued in 1979 and reedited in 1992, urged a "restrictive" interpretation of the exclusion clause. Office of the High Commissioner for Refugees, *Handbook and Guidelines on Procedures and Criteria for Determining Refugee Status under the 1951 Convention and the 1967 Protocol Relating to the Status of Refugees*, para. 149 (Geneva, January 1992) ("*Handbook*").

As the UNHCR has recognized, the question of how to interpret the treaty is clearly left to the States that adopted it. *See id.* While the views of the UNHCR may be "a useful interpretive aid," they are "not binding on the Attorney General, the [Board], or United States courts." *INS v. Aguirre-Aguirre*, 526 U.S. 415, 427 (1999); *see also INS v. Cardoza-Fonseca*, 480 U.S. 421, 439 n.22 (1987) ("[T]he explanation in the U.N. Handbook [does not have] the force of law [nor does it] in any way bind[] the [agency] . . . ."); *Guidelines* at 1 (stating that the *Guidelines* are not binding and are "intended to provide interpretative legal guidance"). Further, we recently declined to adopt the UNHCR's approach to particular social group analysis for asylum where an alternative interpretation "more accurately captures the concepts underlying the United States' obligations under the Protocol and will ensure greater consistency in the adjudication of asylum claims under the Act." *Matter of M-E-V-G-*, 26 I&N Dec. 227, 248–49 (BIA 2014). We should do the same in this case.

The majority cites to member States that have adopted some form of a duress exception. However, there is no clear, consistent resolution of this issue within the international community. *See Prosecutor v. Erdemovic*, Case No. IT-96-22-T, ¶¶ 67, 88 (Int'l Crim. Trib. for the Former Yugoslavia 1997) (joint separate opinion of Judge McDonald and Judge Vohrah) ("The rules of the various legal systems of the world are . . . largely inconsistent regarding the specific question whether duress affords a complete defence to a combatant charged with a war crime or a crime against humanity involving the killing of innocent persons."); *see also Negusie*, 555 U.S. at 526 (Scalia, J., concurring) ("[T]here is no historical support for the duress defense when a soldier follows a military order he knows to be unlawful.").

The majority reads too much into "the international understanding" of the member States' obligations under Article 1F of the Convention. The drafters of Article 1F were focused on preventing persecutors from benefiting from the protections of the Convention, not on protecting persecutors who acted under some form of coercion. But even to the extent that member States have found an implied duress exception from Article 1F, we are under no

obligation to follow their interpretation. We should act based on an understanding of our own statutory and treaty obligations, not on international expectations.

## C. Intent of Congress

Congress' policy of protecting refugees is based on our Nation's condemnation of persecution. *See, e.g.*, Refugee Act § 101(a), 94 Stat. at 102 ("The Congress declares that it is the historic policy of the United States to respond to the urgent needs of persons subject to persecution in their homelands . . . ."). Congress has enacted a comprehensive statutory scheme to address immigration and refugee protection in the United States, and it has deliberately targeted certain immigration problems with specific solutions in the Act. *See Cardoza-Fonseca*, 480 U.S. at 427, 436–37; *see also Oceanic Steam Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909) ("[O]ver no conceivable subject is the legislative power of Congress more complete than it is over" the decision to admit or to exclude aliens). The "interlocking, interrelated, and interdependent" statutory scheme created by Congress to address immigration reasonably provides that those who have persecuted others are not entitled to the same protection as their victims. *Massachusetts Mut. Life Ins. Co. v. Russell*, 473 U.S. 134, 146 (1985).

Under the statutory scheme, an individual who has engaged in persecution is barred from asylum and withholding of removal but may still receive deferral of removal under the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *adopted and opened for signature* Dec. 10, 1984, G.A. Res. 39/46, 39 U.N. GAOR Supp. No. 51, at 197, U.N. Doc. A/RES/39/708 (1984) (entered into force June 26, 1987; for the United States Apr. 18, 1988) ("Convention Against Torture"). Sections 208(b)(2)(A)(i), 241(b)(3)(B)(i) of the Act, 8 U.S.C. §§ 1158(b)(2)(A)(i), 1231(b)(3)(B)(i) (2012); 8 C.F.R. §§ 1208.16(d)(2), 1208.17(a) (2018); *see also Negusie*, 555 U.S. at 513–14.

Given the Act's "interlocking, interrelated, and interdependent" scheme, the assumption that Congress inadvertently omitted a voluntariness requirement for the persecutor bar "is rendered especially suspect." *Russell*, 473 U.S. at 146. While the legal standard is not the same, the strict application of the persecutor bar is tempered to some degree by the fact that such an alien remains eligible for the more limited protection of deferral of removal under the Convention Against Torture. *See Negusie*, 555 U.S. at 514. The applicant's case embodies this principle, since the Immigration Judge granted deferral of removal under the Convention Against Torture, which the Department of Homeland Security ("DHS") has not challenged.

Congress has also included provisions that ameliorate the immigration consequences of certain conduct through waivers or exceptions. Most significantly, in 2005 Congress created a waiver in section 212(d)(3)(B)(i) of the Act, 8 U.S.C. § 1182(d)(3)(B)(i) (Supp. V 2005), to provide a mechanism for the Government to exercise its unreviewable discretion to allow aliens to avoid the consequences of the bar for providing material support to terrorists. *See Matter of S-K-*, 23 I&N Dec. 936, 941 (BIA 2006) (noting that the inclusion of the waiver was a means of balancing the "harsh provisions" of the material support bar), *remanded*, 24 I&N Dec. 289 (A.G. 2007), *clarified*, 24 I&N Dec. 475 (BIA 2008).[2]

In fact, it would be very reasonable for Congress to provide a waiver similar to the one it enacted for material support for a terrorist organization. A waiver would be a better avenue for ameliorating the effects of the persecutor bar in deserving cases than the duress exception the majority creates. By enacting the material support waiver, Congress effectively addressed the over-inclusive nature of the material support bar by allowing the Secretaries of State and Homeland Security to consider each situation in a more holistic manner. Further, the waiver is not limited to an alien who acts under duress. *See, e.g.*, *Sesay v. Att'y Gen. of U.S.*, 787 F.3d 215, 223 n.8 (3d Cir. 2015) (noting that the Secretaries "have continued to expand the categories of activities eligible for waiver" (citation omitted)); *Annachamy v. Holder*, 733 F.3d 254, 263 n.10 (9th Cir. 2013) ("The Act amended the waiver provision to permit the Secretary to waive almost all of the terrorism-related bars."), *overruled on other grounds by Abdisalan v. Holder*, 774 F.3d 517 (9th Cir. 2014). A waiver could more effectively allow for consideration of all the facts and circumstances holistically in any given case regarding not only duress but also other issues. It could help ensure that asylum was granted in meritorious cases and not granted in others, consistent with the humanitarian principles underling the refugee laws.

In *Matter of M-H-Z-*, 26 I&N Dec. 757, 760–61 (BIA 2016), we recently rejected the argument that the Act included an implied duress exception for an alien who has provided material support to a terrorist organization pursuant to section 212(a)(3)(B)(iv)(VI) of the Act. In reaching our conclusion, we relied on the "well-known canon of statutory construction that '[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or

---

[2] Other examples of Congress providing ameliorative provisions are found in its treatment of first offenses for alien smuggling and counterfeiting involving certain family members, as well as petty offenses for crimes involving moral turpitude. *See* sections 101(a)(43)(N), (P), 212(a)(2)(A)(ii)(II) of the Act, 8 U.S.C. §§ 1101(a)(43)(N), (P), 1182(a)(2)(A)(ii)(II) (2012).

exclusion.'" *Id.* at 761 (alteration in original) (quoting *Cardoza-Fonseca*, 480 U.S. at 432). We found it significant that Congress created explicit exceptions for involuntary actions in other parts of the Act and also created a waiver under section 212(d)(3)(B)(i) of the Act. *Id.* at 761–62. These principles of statutory construction should be applied equally in the case before us.

For example, Congress created an explicit exception to the ground of inadmissibility based on an alien's membership in a Communist or other totalitarian party for an alien who establishes that "the membership or affiliation is or was involuntary." Section 212(a)(3)(D)(ii) of the Act. There is also an explicit exception to the material support provision in section 212(a)(3)(B)(iv)(VI)(dd) for aliens who demonstrate a lack of knowledge that the organization was a terrorist organization. In section 208(c)(2)(D) of the Act, Congress provided that asylum may be terminated when an "alien has voluntarily availed himself or herself of the protection of the alien's country of nationality."

The persecutor bar in our asylum laws did not originate with the Refugee Act, and we have never before adopted a duress exception to a persecutor bar. The persecutor bar, including the exact phrase "ordered, incited, assisted, or otherwise participated in the persecution of any person because of race, religion, national origin, or political opinion," was first added to the Act in 1978 by sections 101 and 103 of the Holtzman Amendment, Pub. L. No. 95-549, 92 Stat. 2065, 2065–66 (1978). Congress provided the exclusion and deportation grounds at former sections 212(a)(33) and 241(a)(19) of the Act, 8 U.S.C. §§ 1182(a)(33) and 1251(a)(19) (Supp. II 1978), to ensure that persons who entered the United States by means other than the Displaced Persons Act of 1948, ch. 647, 62 Stat. 1009 ("DPA"), or the Refugee Relief Act of 1953, ch. 336, 67 Stat. 400 ("Refugee Relief Act"), would not also be entitled to procure or retain immigration benefits if they had assisted Nazi Germany or others in persecution. *See Matter of Laipenieks*, 18 I&N Dec. 433, 456 (BIA 1983), *rev'd on other grounds*, 750 F.2d 1427 (9th Cir. 1985).

We have interpreted the bar added by the Holtzman Amendment, which contained the same statutory language as the Act's current persecutor bar, as extending to guards whose service was involuntary. *See Matter of Kulle*, 19 I&N Dec. 318, 332 (BIA 1985) (finding the alien deportable under former section 241(a)(19) of the Act because his service as a perimeter guard to prevent prisoners from escaping constituted "assistance in persecution," even if it was involuntary), *aff'd*, 825 F.2d 1188 (7th Cir. 1987); *see also, e.g.*, *Fedorenko*, 449 U.S. at 510, 512 (holding that an "individual's service as a concentration camp armed guard—whether voluntary or involuntary—made him ineligible for a visa" under section 2(a) of the DPA, 62 Stat. at 1009, as a person who had "assisted the enemy in persecuting civil[ians]" (alteration

in original)); *Matter of Fedorenko*, 19 I&N Dec. at 68 (finding the alien deportable under former section 241(a)(19) of the Act, despite his claim of involuntary service); *Matter of Laipenieks*, 18 I&N Dec. at 463–65.

As the Court discussed in *Negusie*, 555 U.S. at 522–23, these cases addressed a different statute, and the principles of statutory construction invoked in *Fedorenko* are not binding here. However, regardless of differences in the legislative context, the relevant judicial and administrative interpretations of the various statutes have never found a duress exception for persecutors.[3] Congress has never acted to change these interpretations.

In fact, subsequent to these judicial and administrative interpretations, Congress recodified the persecutor bar in 1996 by moving the language in former section 243(h) of the Act, 8 U.S.C. § 1253(h) (1994), to section 241(b)(3) but without changing it. *See* Illegal Immigration Reform and Immigrant Responsibility Act of 1996, Div. C of Pub. L. No. 104-208, §§ 305(a)(3), 601(a)(1), 604(a), 110 Stat. 3009-546, 3009-602, 3009-689, 3009-691. Congress' use of the persecutor bar language from the Refugee Act in section 241(b)(3)(B)(i) of the Act without including a duress exception suggests that it did not intend a different interpretation for the persecutor bar.

Further, Congress has twice addressed the waiver provision for the material support bar without providing a similar waiver in the persecutor bar context, even though neither had been interpreted to have an implied duress exception. *See* REAL ID Act of 2005, Div. B of Pub. L. No. 109-13, § 104, 119 Stat. 302, 309; Consolidated Appropriations Act, 2008, Div. J of Pub. L. No. 110-161, § 691(a), 121 Stat. 1844, 2364; *see also Annachamy*, 733 F.3d at 262 n.8. Thus, Congress has had several opportunities to add a duress exception or provide a waiver to the persecutor bar to clarify the issue if it intended such a result. The fact that it has never done so should be instructive as to the proper course for us to follow.[4]

---

[3]  In 1950, Congress added a second persecutor bar to the DPA, which provided that "[n]o visas shall be issued . . . to any person who advocated or assisted in the persecution of any person because of race, religion, or national origin." Act of June 16, 1950, ch. 262, § 11, 64 Stat. 219, 227 (amending section 13 of the DPA). Courts refused to recognize a duress exception to this provision. *See United States v. Reimer*, 356 F.3d 456, 459–60 (2d Cir. 2004). Subsequently, Congress enacted the Refugee Relief Act, in which it provided that "[n]o visa shall be issued under this Act to any person who personally advocated or assisted in the persecution of any person or group of persons because of race, religion, or national origin." Refugee Relief Act, § 14(a), 67 Stat. at 406. Courts concluded that, based on the plain language of statute, there is no voluntariness requirement. *See United States v. Hansl*, 439 F.3d 850, 854 (8th Cir. 2006); *United States v. Kumpf*, 438 F.3d 785, 790–91 (7th Cir. 2006); *United States v. Friedrich*, 402 F.3d 842, 844–45 (8th Cir. 2005).

[4]  The majority's discussion of the Child Soldiers Accountability Act of 2008, Pub. L. No. 110-340, 122 Stat. 3735, which enacted 18 U.S.C. § 2442 (2012), a more specific statute,

### D. Duress Standard

After creating a duress exception to the persecutor bar, the majority proceeds to create a legal standard for duress that is not tied to any specific source but, instead, appears to be a hybrid approach that finds support in the Model Penal Code, Federal law, the common law of criminal duress, and international sources, including guidance of the UNHCR. The standard it creates is generally consistent with the criminal law of duress but, at bottom, depends on whether the persecutor "acted under an imminent threat of death or serious bodily injury to himself or others." *Matter of Negusie*, 27 I&N Dec. 347, 363 (BIA 2018). It is, of course, far from clear how this standard will be applied in practice, but the phrase "serious bodily injury" is defined in various Federal criminal statutes as including "impairment of the function of a bodily member." *See, e.g.*, 18 U.S.C. § 113 (2012) (referencing 18 U.S.C. § 1365(h)(3) (2012)). Federal courts have defined "serious bodily injury" to include one person breaking another's ankle or biting another person. *See United States v. Mutte*, 424 F. App'x 765, 767–68 (10th Cir. 2011); *United States v. Moore*, 846 F.2d 1163, 1166–67 (8th Cir. 1988).[5] Thus, the persecutory conduct that could be excused under the majority's approach is much broader than it may appear.

The majority repeatedly emphasizes that the duress exception it creates is limited and narrow in scope, but characterizing it as such does not make it so. The parameters the majority attempts to place on the standard it creates are vague. They will be hard to apply in a consistent manner and, as a practical matter, will not effectively limit the application of the exception. There are myriad possible factual scenarios and circumstances that could meet the standard announced today.

---

many years after the more general persecutor bar, does more to undermine the reasoning of the majority than to support it. *See HCSC-Laundry v. United States*, 450 U.S. 1, 6 (1981) (per curiam) (applying the "basic principle of statutory construction that a specific statute . . . controls over a general" one). This law provides criminal penalties for those who recruit or use child soldiers in their illicit activities. To the extent that the Act can be read as expressing an intent that child soldiers should be eligible for asylum, it would be an indication that Congress can amend the immigration laws to protect certain groups from an asylum bar when it chooses to do so. *See Matter of M-H-Z-*, 26 I&N Dec. at 761. Moreover, in discussing this issue, the majority mischaracterizes this dissent as automatically barring former child soldiers from asylum. The statute defines child soldiers as those under the age of 15, and we need not decide at this time whether a child of just 14 years or younger has the legal capacity to form the intent to commit acts that the persecutor bar was intended to address.

[5] Moreover, the persecutor's conduct that would qualify for the duress exception under the majority's approach is not limited to harm to himself or a family member but could include "any person."

In these cases, the applicant's credibility will be key and generally dispositive of the claim. But credibility can be hard to discern in any asylum case and can be even more challenging in a case that involves the persecutor bar. It is often hard to evaluate the reliability of testimony and other evidence, and even more difficult and unusual for the DHS to meaningfully investigate incidents that an applicant claims occurred years before in his home country. *See Angov v. Lynch*, 788 F.3d 893, 901 (9th Cir. 2015); *see also, e.g.*, *Dia v. Ashcroft*, 353 F.3d 228, 261–62 (3d Cir. 2003) (Alito, J., concurring in part and dissenting in part). An Immigration Judge at least can require an applicant for asylum to present reasonably available corroborating evidence to meet his burden of proof. *See* section 208(b)(3)(B)(iii) of the Act. However, it is unclear what, if any, corroboration an Immigration Judge could reasonably require of an alien who claims that he was coerced into persecuting an innocent person. It is also exceedingly unlikely that the individual who coerced the persecutor would provide such corroboration. Thus, there is a serious risk that applicants will be granted asylum after falsely claiming they persecuted innocent victims under duress. *See Negusie*, 555 U.S. at 524 (noting that our interpretation "may be influenced by how practical, or impractical, the standard would be in terms of its application to specific cases").

The majority's duress exception will add more complexity to our already complex asylum laws and to the adjudication of individual cases in the Immigration Courts, as well as before the DHS. It will also adversely impact Justice Department prosecutions for human rights violations. The unintended consequences will be that many persecutors will improperly obtain asylum relief, contrary to the fundamental purpose of the asylum laws to protect legitimate victims of persecution.

Going forward, the majority's approach will require us to address not only the parameters of this duress exception but also whether an implied duress exception should be adopted in various other provisions of the Act. Adopting a duress exception to the persecutor bar will require us to confront whether to adopt the criminal law principles of duress to excuse other related and very serious misconduct that would otherwise bar aliens from relief, such as for their involvement in genocide or extrajudicial killings. *See* sections 212(a)(3)(E)(ii), (iii) of the Act. Also, there are other types of misconduct that bar relief using the same operative language as the persecutor bar, such as alien smuggling. *See* section 212(a)(6)(E) of the Act. Further, claims for a duress exception could arise in situations where an alien may be barred from relief based on a lack of good moral character. *See* sections 101(f)(3), (9) of the Act (relating to alien smugglers under section 212(a)(6)(E) and to aliens who assisted in Nazi persecution, participated in genocide, or

committed acts of torture or extrajudicial killing under section 212(a)(3)(E), respectively).

For the reasons discussed above, we should not read a duress exception into the Refugee Act or the treaty. *See Chan v. Korean Air Lines, Ltd.*, 490 U.S. 122 (1989) ("We are to find out the intention of the parties by just rules of interpretation applied to the subject matter; and having found that, our duty is to follow it as far as it goes, and to stop where that stops—whatever may be the imperfections or difficulties which it leaves behind." (quoting *The Amiable Isabella*, 19 U.S. (6 Wheat.) 1, 71 (1821))). It is clear that Congress can and does expressly excuse involuntary actions and provide waivers or exceptions to the statutory bars to relief when it deems them appropriate. *See Matter of M-H-Z-*, 26 I&N Dec. at 761; *see also, e.g.*, *Whitfield v. United States*, 543 U.S. 209, 216–17 (2005) (stating that where Congress has included certain requirements in other statutes but not the one under review, courts should not "override that choice"). Congress is the entity that should adopt a duress exception or a waiver for the persecutor bar, as it has done in the terrorism context, if it determines that it is in the best interest of the United States to do so. We should resist the temptation to do so ourselves. Thus, I respectfully dissent.